**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ERIC NORRELL, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| AEROVIRONMENT, INC., WAHID NAWABI, KEVIN P. MCDONNELL, and MARY CLUM, | |
| Defendants. | |

Plaintiff Eric Norrell ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AeroVironment, Inc. ("AeroVironment" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired AeroVironment securities

between June 25, 2025 and March 10, 2026, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      AeroVironment operates as a defense technology provider delivering integrated capabilities across air, land, sea, space, and cyber.

3.      On May 1, 2025, AeroVironment announced it had completed the acquisition of BlueHalo, LLC ("BlueHalo"), a defense technology firm specializing in advanced engineering products, in an all-stock transaction with an enterprise value of approximately $4.1 billion.

4.      Three years earlier, BlueHalo had been awarded a $1.4 billion contract to deliver BADGER phased array antenna systems (a type of advanced ground-terminal system used to track satellites), to support the U.S. Space Force's Satellite Communication Augmentation Resource ("SCAR") program.  The BADGER would be a bespoke product designed for the U.S. Space Force, according to its specifications.  This contract value subsequently increased to $1.7 billion.

5.      The SCAR program represents the U.S. Space Force's efforts to modernize antennas used by the Satellite Control Network ("SCN"), which is comprised of 19 fixed antennas across the world and executes tasks such as tracking satellites, transmitting signals, and conducting telemetry, or accessing data from satellites to assess their status and health.

6.      In an April 2023 report, the U.S. Government Accountability Office described the SCN as "aging and difficult to maintain."  The U.S. Space Force has described the purpose of the SCAR program as modernizing the aging SCN by introducing phased array antennas to the network that boast newer capabilities, such as the ability to communicate with more than one satellite simultaneously.

7.    During the Class Period, Defendants consistently assured investors that the SCAR program would drive revenue growth for AeroVironment moving forward.  Among other items, Defendants stated that the SCAR program represented a "tremendous growth opportunity," that AeroVironment's work pursuant to the contract was "very much on track," that the customer was "asking for more [BADGER systems]," and that the Company stood "ready to build more."

8.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) AeroVironment understated the likelihood that it would imminently face competition from other vendors for the work it performed in connection with the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN; (ii) accordingly, Defendants overstated AeroVironment's business and financial prospects; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

9.    On January 20, 2026, AeroVironment announced that the U.S. government had issued a stop work order on the Company's agreement to deliver BADGER systems to the SCAR program.  In the same announcement, AeroVironment stated that the stop work order "allows for the parties to negotiate an amended agreement for the future of the SCAR program" and that "[t]he Company expects to continue to deliver capabilities and products for the SCAR program."

10.    On this news, AeroVironment's stock price fell $61.97 per share, or 15.77%, to close at $330.89 per share on January 20, 2026.

11.    Then, on March 2, 2026, *Space News* reported that the U.S. Space Force was reopening the SCAR program and "reassessing how to move forward."  *Space News* quoted Colonel Owen Stevens, director of contracting at the Space Rapid Capabilities Office, which

supervised SCAR, as stating, "We have been in conversations with the [senior acquisition executive] *for a little while now*, and we are going to move into a new acquisition strategy for SCAR."

12. On this news, AeroVironment's stock price fell $43.93 per share, or 17.42%, to close at $208.32 per share on March 2, 2026.

13. Then, on March 10, 2026, AeroVironment announced its financial results for the third quarter of fiscal year 2026. Among other items, AeroVironment reported a third-quarter operating loss of $179.0 million, compared to an operating loss of $3.1 million for the same period in fiscal year 2025. These financial results reflected the impact of a $151.3 million goodwill impairment in the Company's space division after the stop work order on the Company's BADGER systems built for the SCAR program. AeroVironment also reported that the U.S. Space Force had terminated the Company's contract concerning the SCAR program, and as a result, it would have to "*recompete*" for the SCAR program.[1]

14. On this news, AeroVironment's stock price fell $13.84 per share, or 6.24%, to close at $207.73 per share on March 11, 2026.

15. On March 31, 2026, the U.S. Space Force announced its decision to diversify suppliers and rely on less costly commercial, off-the-shelf solutions in connection with its work to upgrade the SCN, instead of pursuing another single-vendor bespoke solution.

16. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

---

[1] All emphases herein have been added unless otherwise indicated.

4

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

19.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  AeroVironment is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

20.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

21.    Plaintiff, as set forth in the attached Certification, acquired AeroVironment securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22.    Defendant AeroVironment is a Delaware corporation with principal executive offices located at 241 18th Street South, Suite 650, Arlington, Virginia, 22202.  AeroVironment's common stock trades in an efficient market on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "AVAV."

5

23.    Defendant Wahid Nawabi ("Nawabi") served as AeroVironment's President and Chief Executive Officer at all relevant times.  Nawabi has also served as Chairman of the Company's Board of Directors at all relevant times.

24.    Defendant Kevin P. McDonnell ("McDonnell") served as AeroVironment's Chief Financial Officer ("CFO") at all relevant times.

25.    Defendant Mary Clum ("Clum") served as President of AeroVironment's Space, Cyber & Directed Energy business segment from October 2025 through the end of the Class Period.  Previously, Defendant Clum was President of BlueHalo's Product and Space Systems portfolio.

26.    Defendants Nawabi, McDonnell, and Clum are collectively referred to herein as the "Individual Defendants."

27.    The Individual Defendants possessed the power and authority to control the contents of AeroVironment's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of AeroVironment's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with AeroVironment, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

28.    AeroVironment and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

29. AeroVironment operates as a defense technology provider delivering integrated capabilities across air, land, sea, space, and cyber.

30. On May 1, 2025, AeroVironment announced it had completed the acquisition of BlueHalo, a defense technology firm specializing in advanced engineering products, in an all-stock transaction with an enterprise value of approximately $4.1 billion.

### Materially False and Misleading Statements Issued During the Class Period

31. The Class Period begins on June 25, 2025. One day earlier, AeroVironment issued a press release announcing the Company's financial and operating results for the fiscal fourth quarter and year ended April 30, 2025. This press release included an outlook for the then-upcoming fiscal year, stating in relevant part:

> *For fiscal year 2026* inclusive of the projected results of the BlueHalo acquisition, which closed May 1, 2025, *the Company expects revenue of between $1.9 billion and $2.0 billion*, non-GAAP adjusted EBITDA of between $300 million and $320 million, *and non-GAAP earnings per diluted share*, which excludes amortization of intangible assets, other non-cash purchase accounting expenses and equity securities investments gains or losses, *of between $2.80 and $3.00*.

32. On September 9, 2025, AeroVironment issued a press release announcing the Company's financial results for the fiscal quarter ended August 2, 2025 (the "Q1 Earnings Release"). Among other representations, the Q1 Earnings Release provided investors with AeroVironment's updated guidance for the full fiscal year 2026, which included the same outlook as to revenue and an improved outlook as to non-GAAP earnings per share, stating *inter alia*:

> *For fiscal year 2026, the Company continues to expect revenue of between $1.9 billion and $2.0 billion*, net loss of between $(77) million and $(72) million, non-GAAP adjusted EBITDA of between $300 million and $320 million, loss per diluted share of between $(1.63) and $(1.53) *and non-GAAP earnings per diluted share*, which excludes amortization of intangible assets, other non-cash purchase

7

accounting expenses and equity securities investments gains or losses, *of between $3.60 and $3.70*.

33.    Also on September 9, 2025, AeroVironment held a conference call to discuss the financial results announced in the Q1 Earnings Release (the "Q1 Earnings Call").  During the Q1 Earnings Call, Defendant Nawabi conveyed that the BADGER systems, the product at issue in the SCAR contract, "will be [a] key growth driver[] . . . in the future", stating *inter alia*:

> Now on to our second segment, Space, Cyber and Directed Energy, or SCDE segment.  Our SCDE segment posted first-quarter revenues of $169 million.  Our Space Technologies and directed energy solutions will continue to drive growth in this segment and for the company.  As I mentioned earlier, we announced yesterday a $240 million contract award for our long-haul space laser communication system. In addition to anticipated revenue growth from this area, *we're confident that our BADGER phased array solution and our Counter-UAS directed energy solutions, LOCUST, will be key growth drivers for this segment in the future*.

34.    Later during the Q1 Earnings Call, Defendant McDonnell conveyed Defendants' confidence concerning AeroVironment's financial performance moving forward, specifically as to gross margins, stating *inter alia*:

> First year — first quarter adjusted gross margins were 29% versus 45% in the first quarter of FY '25.  As noted, the business landscape of the combined new company has changed significantly with a higher service mix and several products in early stages of maturation.  We believe adjusted gross margins should continue to improve throughout the year, ending up in the mid-30s by Q4 with an average for the year in the low 30s.

35.    Later during the Q1 Earnings Call, in response to an analyst's question concerning Defendants' full 2026 fiscal year guidance of $1.9 to 2.0 billion and the potential for upside to that guidance, Defendant Nawabi stated that Defendants "feel very strong about our current guidance," stating *inter alia*:

> There's only so much planning and at risk that we can go given the situation that we're in right now.  So for that reason, *I would say we feel very strong about our current guidance*.  Some of that OBD dollars is baked into our guidance and our expectations, but some of it's not.  And then every day that goes by, by the budgets not being approved or a continuing resolution going forward or the dollars not

8

hitting their accounts, it could actually — it actually adds more risk for that not to happen this year, but it will happen the following year. ***Regardless, we're going to have a great year***, and we're going to most likely going to finish the year strong with a very strong pipeline in bookings that can set us up for even more success beyond fiscal '26.

36.    On September 30, 2025, AeroVironment held its Investor Open House.  Among other representations, Defendant Nawabi communicated to investors the importance of SCAR and the BADGER product that AeroVironment would purportedly deliver to the U.S. Space Force, claiming that it is "a $1 billion franchise," stating *inter alia*:

> One of our very old investor — old many long-term investors asked me a question last night.  It was a very good question actually.  It's a question that I asked myself a lot.  And it was 'Wahid, what are you most excited about?'  So this is all great, and I'll give you the top 10 list. . . .  ***SCAR and our BADGER space comms is really key.  That's a $1 billion franchise***.

37.    Also during the Investor Open House, Defendant Clum touted AeroVironment's close communication with the U.S. Space Force as the Company's "entire team" was "shoulder-to-shoulder" with the agency, and represented both that the U.S. Space Force was "asking for more" products from AeroVironment and that the Company stood ready to "build more" in response, stating *inter alia*:

> So let's start with our first technology you're going to see in Albuquerque, our BADGER.  Here's an example of BADGER right here.  We're going to highlight a program win.  That's the Satellite Control Augmentation Resource program, or SCAR.  It's an awarded value of $1.7 billion, extending all the way through '23 — 2030.  ***But what set us apart — it's what Wahid he told you. It was not size. It's the way we work.  We put our entire team shoulder to shoulder with the customer.  We listen, we adapt and we designed with them.  So SCAR's a program locked in, in a very high barrier to entry market.  [B]ut our team did it.  And what's our customer saying,  I'm going to quote him***.  And I want to pause on this a little bit because it emphasizes that demand and urgency that the [S]pace [F]orce has.  So in June of 2025, Breaking defense quoted Dr. Kelly Hammett, he's the Director of the Space Force Rapid Capabilities Office.  He said, and I'm going to read his quote. ***We're going to need a bunch of SCARs, and we're going to need them fast as we can make them***. . . .  ***We're ready to scale***.  You're going to see this.  Our whole facility is outfitted with full test automation and the manufacturing is underway in

the first deliveries this year.  *So the customer is asking for more.  We're ready to build more*.  But rather than making me describe it, let's see BADGER in action.

38.    On December 3, 2025, Defendant Nawabi appeared on behalf of AeroVironment at Goldman Sachs' Industrial and Materials Conference, where he represented that SCAR and the Company's BADGER system would be "major contributors to growth," just three months before investors would learn that AeroVironment's work for SCAR was under review, stating *inter alia*:

> Our strategy fundamentally is we're going after very large categories that we can disrupt and be the leader and innovate and have high growth and high value creation. . . .  Each one of these opportunities is $1 billion, slightly less than $1 billion or a couple of plus billion dollars large. . . .  *In some cases, we're the only player. Like SCAR, as Kevin mentioned, we've been already selected*. So which one is going to happen when is incredibly difficult to predict in terms of timing. That's the fundamental reason why we don't provide that level of granularity because it is really difficult to be able to time that from the customers' behavior and processes. . . .  Now having said that, these are -- *there are certain areas that I can very confidently think that over the next several years, it's going to be major contributors to growth* . . . .  So the best way to look at it is, you can decide which one you think is going to happen, but I can give you a basket of things that's going to contribute to the growth. . . .  *The other area is SCAR and BADGER. That's a program that we've won.  It's $1.7 billion worth of funding that's going to be put into that to modernize the entire U.S. space satellite, geosynchronous satellites with our systems phased arrays*.

39.    On December 9, 2025, AeroVironment filed with the SEC a current report on Form 8-K announcing its financial results for the second quarter of the 2026 fiscal year and held a conference call to discuss the same (the "Q2 Earnings Call").  During that call, Defendant Nawabi continued to represent that the SCAR program represented a "*tremendous growth opportunity*," giving no indication that the program might be under review or that AeroVironment might mutually agree to a stop work order in the following month, stating *inter alia*:

> [AeroVironment] won several key awards in our Space, Cyber and Directed Energy segment with critical new contracts in Laser Communications, Space-related Satellite Communications and Directed Energy. . . .  *[AeroVironment] secured a new firm fixed price option for 2 BADGER phased array systems under the SCAR or Satellite Communication Augmentation Resource program.  This program*

10

*represents a tremendous growth opportunity for [AeroVironment] as more BADGER systems move into production*.

40.    Also during the Q2 Earnings Call, Defendant McDonnell similarly touted a "*significant*" contract for "*2 BADGERs for the U.S. Space Force*," stating *inter alia*:

The space and directed energy products grew more than 20% in the quarter versus the prior year, with the LOCUST Directed Energy Counter-UAS growth being one of the key drivers. *As Wahid mentioned earlier, this segment also received several large contracts this past quarter to include a significant contract for our long-haul laser communications and 2 BADGERS for the U.S. Space Force's SCAR program*.

41.    Later during the Q2 Earnings Call, in response to an analyst's question concerning this contract and Defendants' view as to "the expected ramp" for the SCAR program, Defendant Nawabi represented that AeroVironment's work for the program was "*very much on track,*" that AeroVironment was making progress "shifting now from development activity to delivering products," and conveyed Defendants' expectation that "the margins and revenue of that business" would "improve" both in the 2026 fiscal year and "beyond," stating *inter alia*:

[A]s I mentioned in my remarks, we did secure an additional task order and award from the U.S. Space Force for additional BADGERS — 2 more additional BADGERS.  The whole SCAR program, as we mentioned in our comments before, has been so far in a customer-funded development process.  *We're shifting now from development activity to delivering products*, most of which is going to end up eventually going into our firm fixed price contracts.  *That transition not only ramps up the revenue for the second half of the year, but also improves the margin profile of that business.  So we're very much on track with our plans*.  We're pleased with the performance so far, and *we expect the margins as well as the revenue of that business to actually improve in the third and fourth quarter of this year and continue to improve beyond this fiscal year*.

42.    Also during the Q2 Earnings Call, in response to an analyst's question concerning AeroVironment's guidance for the 2026 fiscal year, Defendant Nawabi affirmed that Defendants remained "confident," and tied this position to expected contracts and awards from sources including the SCAR program "in the second half of the year," stating *inter alia*:

11

[W]e are expecting and we're expecting multiple task orders and orders on the second half that we believe we're going to be able to convert that to revenue. In order for us to overperform is going to be more difficult because of the timing, how long it takes to go build those products, get them tested and accepted by the customer and then deliver to our customers. *So we're confident about our full year guidance, number one. Number two, we do expect contract awards and task orders in the second half that will convert to revenue and that's part of our forecast, and we're confident that we can achieve that*. . . . *[I]t's a very nice, nice portfolio or basket of contracts and awards that we expect*. It's basically the critical areas that the U.S. DoD needs them desperately and we've been talking about. So P550, more Switchblade, more One-Way Attack, more Counter-UAS, more Directed Energy, *more SCAR and BADGERS*. And *those are the key areas that we expect more of in our second half of the year*.

43.    The statements referenced in ¶¶ 31–42 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) AeroVironment understated the likelihood that it would imminently face competition from other vendors for the work it performed in connection with the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN; (ii) accordingly, Defendants overstated AeroVironment's business and financial prospects; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

44.    On January 20, 2026, AeroVironment filed with the SEC a current report on Form 8-K, announcing that the U.S. government issued a stop work order on the Company's agreement to deliver BADGER systems to the SCAR program, upon mutual agreement with the Company.

45.    On this news, AeroVironment's stock price fell $61.97 per share, or 15.77%, to close at $330.89 per share on January 20, 2026.

12

46.     Notwithstanding the foregoing disclosures and resulting drop in AeroVironment's share price, AeroVironment's stock continued to trade at artificially inflated prices due to Defendants' continued false and misleading statements about the likelihood that AeroVironment would imminently face competition from other vendors for the work it performed in connection with the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN.

47.     For example, in the same Form 8-K that AeroVironment announced the stop work order, the Company stated that the stop work order "allows for the parties to negotiate an amended agreement for the future of the SCAR program," which the Company "expected to be a firm-fixed price agreement," and that "[t]he Company expects to continue to deliver capabilities and products for the SCAR program."

48.     The statements referenced in ¶ 47 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) AeroVironment overstated the likelihood and extent of continued revenues from the SCAR program; (ii) accordingly, Defendants overstated AeroVironment's business and financial prospects; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

### The Truth Continues to Emerge

49.     On March 2, 2026, *Space News* reported that the U.S. Space Force was reopening the SCAR program to suppliers other than AeroVironment and "reassessing how to move forward." *Space News* quoted Colonel Owen Stevens, director of contracting at the Space Rapid Capabilities Office, which supervised SCAR, as stating "We have been in conversations with the [senior acquisition executive] *for a little while now*, and we are going to move into a new

acquisition strategy for SCAR."  Colonel Stevens further stated that this new acquisition strategy "will likely take the form of *other companies building versions or variants of SCAR*," departing from the U.S. Space Force's initial decision to award work to a single contractor.  This new development called into question whether the Company would generate any revenue from the SCAR program or the BADGER system.

50.    On this news, AeroVironment's stock price fell $43.93 per share, or 17.42%, to close at $208.32 per share on March 2, 2026.

51.    Analysts recalibrated their expectations of AeroVironment in response to this revelation.  For example, on March 3, 2026, Canaccord Genuity reduced its price target 17.5%, from $400 to $330, after removing SCAR contract revenue for the second half of the 2026 fiscal year from its model.  On March 2, 2026, Raymond James cut its rating on AeroVironment from Strong Buy to Underperform, citing uncertainty regarding the U.S. Space Force's SCAR program, which had been AeroVironment's largest contract at roughly $1.4 billion in expected value.  BTIG noted that AeroVironment "expects to continue executing on the program until recompete awards are handed out, with confidence that there should be little to no impact to FY27 sales," but cautioned investors that "we remain cautious as there was previously little doubt from the company that the program would be recompeted in the first place."  On March 2, 2026, BTIG maintained its Buy rating but noted that "[we] await further details to come when [AeroVironment] reports 3QFY26 earnings (March 10) to address our estimates."

52.    Notwithstanding the foregoing disclosures and resulting drop in AeroVironment's share price, AeroVironment's stock continued to trade at artificially inflated prices due to Defendants' continued false and misleading statements about the likelihood and extent of continued revenues from the SCAR program.

14

53.    For example, on March 3, 2026, AeroVironment issued a press release concerning its purported "Active Negotiations for Contract Amendment to Support U.S. Space Force's SCAR Program," stating *inter alia*:

> ***We remain in active negotiations with the U.S. Space Force regarding AV's contract to deliver ground stations to support the SCAR program***.  AV appreciates that ***the contract was temporarily paused while both parties work together on a firm-fixed-price contract that provides a commercialized product solution with an expedited delivery timeline***.  AV is focused on aligning to customer needs and, as separately announced, is actively investing in expanding manufacturing capacity in Albuquerque, New Mexico to support growth in our Space and Directed Energy platforms, including manufacturing for the SCAR program.  AV's innovation and ability to scale ahead of manufacturing remains a key differentiator, giving us a competitive edge in the broader defense market.  ***AV is confident in its ability to successfully deliver our systems ahead of competitors***.

54.    Then, on March 10, 2026, AeroVironment announced its financial results for the third quarter of fiscal year 2026 and held a conference call to discuss the same (the "Q3 Earnings Call").  Among other items, AeroVironment reported a third-quarter operating loss of $179.0 million, compared to an operating loss of $3.1 million for the same period in fiscal year 2025.  These financial results reflected the impact of a $151.3 million goodwill impairment in the Company's space division after a stop work order tied to the Space Force's SCAR program.  AeroVironment also released updated revenue guidance for the 2026 fiscal year, announcing it expected $1.85 billion to $1.95 billion, lowered from its earlier guidance range of $1.95 billion to $2.0 billion.

55.    During the Q3 Earnings Call, Defendant Nawabi asserted that Defendants "remain in active discussions with the U.S. Space Force regarding the BADGER . . . system" even as he revealed the U.S. Space Force had terminated the Company's $1.7 billion contract and AeroVironment would have to "recompete" for the SCAR program after previously assuring

investors that the SCAR program would be a "*major contributor[] to growth*" for "*the next several years*," stating *inter alia*:

> We remain in active discussions with the U.S. Space Force regarding the BADGER phased array antenna system to support the SCAR or Satellite Communication Augmentation Resource program.  We appreciate that the contract was temporarily paused while we work together on a firm fixed price contract that provides a commercialized product solution.  *As of this morning, we could not come to a mutually acceptable agreement with our customer to modify the existing contract and resume work.  Therefore, the U.S. Space Force has concluded to terminate our existing contract* for convenience, pay us for our allowable incurred cost with a fee *and enable AV to recompete for the program* with their revised requirements and our proposed solution.

56.     Later during the Q3 Earnings Call, Defendant McDonnell explicitly tied the SCAR stop work order and contract cancellation to the Company's financial results for the quarter and Defendants' decision to release lowered revenue guidance for the fiscal year, stating *inter alia*:

> *The well-publicized stop work order for the SCAR program did have a negative impact on the quarter and this is in part the reason we are lowering our full- year guidance.  This resulted in a noncash $151 million goodwill impairment* as the evaluation of the acquired asset, the space business, was *triggered by the SCAR stop-work order*.  The reevaluation resulted in a reduction in the acquisition date value of the acquired space business of approximately 17%. *We do not expect any further adjustments to the impairment as a result of the notification of the customer to terminate the contract for convenience*.

57.     Defendant McDonnell also stated that Defendants expected an "adjustment" to the $3 billion unfunded backlog reported in AeroVironment's financial results, given that approximately half of this figure represented revenues expected from the SCAR program, stating *inter alia*:

> We ended the quarter with $1.1 billion of funded backlog and approximately $3 billion of unfunded backlog. *I should note that approximately $1.5 billion of the unfunded backlog relates to the SCAR program* for which we were under contract at the end of the quarter. *We expect an adjustment to the unfunded backlog as a result of the intent of the customer to terminate* for convenience and the resolution of the customer's obligations under the current contract.

58.     On this news, AeroVironment's stock price fell $13.84 per share, or 6.24%, to close at $207.73 per share on March 11, 2026.

59.     In response to AeroVironment's revelations, analysts lowered their price targets for AeroVironment's stock.  For example, on March 11, 2026, Needham & Co. reduced its price target 11.11%, from $450 to $400, citing the Company's Q3 2026 financial results and the adverse impact of the SCAR stop work order, and reset expectations as to future revenues from the SCAR program.  On the same date, Canaccord Genuity again reduced its price target, this time 10%, from $330 to $300.  On March 12, 2026, BTIG reduced its price target 20.4%, from $415 to $330, citing a "disappointing . . . SCAR termination."

60.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

61.     Defendants had both the motive and opportunity to commit fraud.  ***During the Class Period, Defendants Nawabi and McDonnell together sold approximately 49,199 shares of AeroVironment stock for over $7.8 million in proceeds***.  Defendant Nawabi sold 22,669 shares for over $5.69 million in proceeds, and Defendant McDonnell sold 26,530 shares for over $1.89 million in proceeds.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Defendants specifically referenced their close communication with the U.S. Space Force, as referenced in ¶ 37, and as a result were aware of the significant risk that the U.S. Space Force would terminate its single-vendor contract with AeroVironment and shift toward a multi-vendor acquisition model in connection with its efforts to modernize the aging SCN.

17

62.    Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

### Regulation S-K Item 303

63.    Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required AeroVironment to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants failed to disclose, *inter alia*, the truth that it would imminently face competition from other vendors for the work it performed in connection with the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN. Defendants' failure to disclose the foregoing issues violated Item 303 because these issues represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

64.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired AeroVironment securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein; the officers and directors of the Company, at all relevant times; members of their immediate families; and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

65.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AeroVironment securities were actively traded on

the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by AeroVironment or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

66.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

67.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

68.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of AeroVironment;

- whether the Individual Defendants caused AeroVironment to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of AeroVironment securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

69. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

70. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- AeroVironment securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold AeroVironment securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

71. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

72. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

73.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

75.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of AeroVironment securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire AeroVironment securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

76.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

21

and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for AeroVironment securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about AeroVironment's finances and business prospects.

77.    By virtue of their positions at AeroVironment, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

78.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of AeroVironment, the Individual Defendants had knowledge of the details of AeroVironment's internal affairs.

79.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of AeroVironment. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to

22

AeroVironment's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of AeroVironment securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning AeroVironment's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired AeroVironment securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

80.    During the Class Period, AeroVironment securities were traded in an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of AeroVironment securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of AeroVironment securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of AeroVironment securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

81.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

82. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

83. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

84. During the Class Period, the Individual Defendants participated in the operation and management of AeroVironment, and conducted and participated, directly and indirectly, in the conduct of AeroVironment's business affairs. Because of their senior positions, they knew the adverse non-public information about AeroVironment's misstatement of income and expenses and false financial statements.

85. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to AeroVironment's financial condition and results of operations, and to correct promptly any public statements issued by AeroVironment which had become materially false or misleading.

86. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which AeroVironment disseminated in the marketplace during the Class Period concerning AeroVironment's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause AeroVironment to engage in the wrongful

24

acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of AeroVironment within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of AeroVironment securities.

87. Each of the Individual Defendants, therefore, acted as a controlling person of AeroVironment. By reason of their senior management positions and/or being directors of AeroVironment, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, AeroVironment to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of AeroVironment and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

88. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by AeroVironment.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the class representative;

B. requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated:  May 26, 2026

/s/ Steven J. Toll

Steven J. Toll (Va. Bar No. 15300)
Daniel S. Sommers
S. Douglas Bunch
**COHEN MILSTEIN SELLERS &
    TOLL PLLC**
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

**POMERANTZ LLP**
Jeremy A. Lieberman*
J. Alexander Hood II*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

*\*Pro hac vice* applications forthcoming

26

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, __Eric Norrell_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against AeroVironment, Inc. ("AeroVironment") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire AeroVironment common stock at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of all persons and entities other than Defendants that purchased or otherwise acquired AeroVironment securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in AeroVironment securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

Docusign Envelope ID: 86C28340-4B31-8B03-8273-FFDEF876D321

8.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Executed** ___5/13/2026_____
                        **(Date)**

Signed by:

Eric Norrell

7826A0548983469...
_____
                        **(Signature)**

Eric Norrell
_____
                **(Type or Print Name)**

**AeroVironment, Inc. (AVAV)**                                                                          **Eric Norrell**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 1/7/2026 | 4 | $324.0000 |