**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| In re AeroVironment, Inc. Securities Litigation | **Master File No.** 1:26-cv-1429-AJT-WEF<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS


I. INTRODUCTION ........ 2

II. JURISDICTION AND VENUE ........ 10

III. THE PARTIES ........ 10

IV. OVERVIEW OF DEFENDANTS' DECEPTION OF INVESTORS ........ 13

A. AeroVironment Pays $3.5 Billion To Acquire BlueHalo And Its SCAR Contract ........ 13

B. The SCAR Contract Was The Key To AeroVironment's Growth And The Justification For The Steep BlueHalo Price Tag ........ 14

C. Throughout The Class Period, Defendants Repeatedly Assured Investors That The SCAR Contract Was "Locked In" And BADGER Was "Ready To Scale" ........ 16

D. Reports From Former AeroVironment Employees Confirm That Defendants Knowingly Misled Investors About The Status, Progress, And Value Of The SCAR Program/BADGER Contract ........ 22

E. The 2025 SCAR Request for Information Confirm That Defendants Knowingly Misled Investors About The Status, Progress, And Value Of The SCAR Program/BADGER Contract ........ 40

F. The Truth Emerges As The "Locked In" SCAR Contract Collapses And BADGER'S Technological Limitations Are Exposed ........ 41

1. Just Six Weeks After Assuring Investors That SCAR Was "Very Much On Track," Defendants Stun The Market By Disclosing A Stop-Work Order ........ 42

2. The Space Force Disclosed That It Is Reopening SCAR To Other Vendors, Which Further Revealed Defendants' Earlier Statements As Materially Misleading ........ 44

3. Defendants Finally Admit That The Space Force Terminated The SCAR Contract And Belatedly Record A Goodwill Impairment ........ 47

4. Defendants Restate The SCAR-Related Goodwill Impairment And Disclose A Material Weakness In Internal Controls ........ 48

G. Defendants Also Overstated Multiple Key Financial Metrics Tied To The SCAR Contract ........ 50

H. Post-Class Period Developments ........ 52

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 53

A. Defendants' Materially False And Misleading Statements and Omissions Concerning the Status of the SCAR Contract ..... 53

B. Defendants' Materially False And Misleading Statements And Omissions Concerning The Readiness And Timeline Of The BADGER System And SCAR Program ..... 55

C. Defendants' Materially False And Misleading Statements And Omissions Concerning The Value Of The SCAR Contract ..... 57

D. Defendants' Materially False And Misleading Statements And Omissions Concerning The Goodwill Associated With The SCAR Contract And Related Financial Metrics ..... 60

E. Defendants' Materially False And Misleading Statements Concerning The Risks Involved In The SCAR Contract ..... 65

VI. ADDITIONAL SCIENTER ALLEGATIONS ..... 67

VII. LOSS CAUSATION ..... 72

VIII. INAPPLICABILITY OF STATUTORY SAFE HARBOR ..... 76

IX. PRESUMPTION OF RELIANCE ..... 76

X. CLASS ACTION ALLEGATIONS ..... 78

XI. EXCHANGE ACT COUNTS ..... 80

COUNT I ..... 80

COUNT II ..... 83

COUNT III ..... 84

XII. PRAYER FOR RELIEF ..... 86

XIII. JURY DEMAND ..... 86

Court-Appointed Lead Plaintiffs City of Miami Fire Fighters' and Police Officers' Retirement Trust ("Miami FIPO") and City Pension Fund for Firefighters and Police Officers in the City of Miami Beach ("Miami Beach F&P" and, together with Miami FIPO, "Lead Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, by and through their undersigned counsel, bring this class action on behalf of themselves and all other persons or entities who purchased or otherwise acquired AeroVironment, Inc. ("AeroVironment" or the "Company") securities between June 25, 2025 and June 22, 2026, both dates inclusive (the "Class Period"), and were damaged thereby (the "Class"). Lead Plaintiffs assert claims against AeroVironment and its corporate officers Wahid Nawabi, Kevin P. McDonnell, and Mary Clum under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC"), 17 C.F.R. § 240.10b-5.

Lead Plaintiffs allege the following based on personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on, among other things, the independent investigation of their undersigned counsel. This investigation included a review and analysis of: (i) AeroVironment's public filings with the SEC; (ii) research reports by securities and financial analysts; (iii) records and transcripts of investor conference calls; (iv) publicly available presentations by AeroVironment; (v) press releases and media reports; (vi) securities pricing data; (vii) information supplied by former AeroVironment and BlueHalo employees; (viii) consultations with experts; and (ix) other material and data identified herein. Lead Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidence exists that will

support the allegations in this complaint and will become available to Lead Plaintiffs only after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This securities class action arises from Defendants' materially false and misleading statements and omissions to investors regarding the status and value of AeroVironment's largest and most important government defense contract, and the purported readiness of the Company's satellite communications system for that contract. During the Class Period, Defendants repeatedly touted AeroVironment's $1.7 billion Satellite Communications Augmentation Resource ("SCAR") contract (the "SCAR Contract") with the U.S. Space Force for the production of AeroVironment's satellite antenna dubbed the Broad Area Deployable Ground terminal Enabling Resilient communication ("BADGER") system. For example, Defendants represented that AeroVironment's SCAR Contract was "***locked in***" with the government, claimed that "***most key development milestones for the SCAR program have already been completed***" and that "***with the technology ready to scale*** . . . ***BADGER is ready***" and "***in[] production***." Defendants also touted the purported $1.7 billion revenue boost the SCAR Contract was supposed to generate. These representations were critical to AeroVironment's growth trajectory, and they helped Defendants justify the Company's $3.5 billion acquisition of BlueHalo, which they consummated largely to take over the SCAR Contract.

2. Defendants knew throughout the Class Period that these representations were false, materially misleading, and omitted necessary information. In truth, the Company's BADGER system was at all times non-functional due to key component failures and technological limitations, the Space Force repeatedly expressed its extreme displeasure with BADGER's performance, threatened to terminate the SCAR Contract, and was actively exploring alternative vendors, as internally recognized and communicated to senior management. Simply put,

AeroVironment's SCAR Contract—the "really key" $1 billion franchise that Defendants claimed was "locked in" and "ready to scale"—was already doomed to fail. Tellingly, at the same time they were touting the SCAR Contract and boasting about the imminent "revenue ramp" and improved "margin profile" it would generate, Defendants Nawabi (CEO) and McDonnell (CFO)—the Company's most senior executive officers—were unloading millions of dollars of their own personal Company stock holdings at fraud-inflated prices, in highly suspicious circumstances and in amounts dramatically out-of-line with their prior practices.

3. Investors learned the truth in stages. A series of partially corrective disclosures revealed that the SCAR Contract was severely compromised and ultimately terminated outright. Defendants also were forced to take a goodwill impairment charge relating to the contract—and, making matters worse, had to restate the impairment charge because it was too low. In total, these corrective disclosures caused AeroVironment's stock price to decline by more than ***$138 per share***, erasing nearly $7 billion in shareholder value.

4. AeroVironment is a defense technology company that designs and manufactures defense systems. Just before the start of the Class Period, AeroVironment expanded its offering by acquiring BlueHalo, a privately-held defense technology company that developed ground-based satellite communications systems under contracts with the Space Force and other Department of War components, in an all-stock transaction that Defendants valued at approximately $3.5 billion at the time of closing (at the time of offer, the stock consideration was valued at $4.1 billion). As part of the transaction—indeed the main purpose of the transaction—AeroVironment acquired BlueHalo's SCAR Contract with the Space Force and its related BADGER satellite communication and control system.

5. The SCAR Contract was foundational to AeroVironment's growth. It was the Company's single largest contract, representing approximately 37% of AeroVironment's total backlog. Defendant Nawabi (CEO) hailed SCAR and BADGER as a "$1 billion+" franchise that was "really key" to the Company's growth strategy. As such, Nawabi was intensely focused on the SCAR Contract, which he expressly stated was one of his "top priorities." The SCAR Contract was also the linchpin of the BlueHalo acquisition and viewed as AeroVironment's top growth driver. Accordingly, Defendants discussed SCAR at length on every earnings call and at investor conferences throughout the Class Period. Defendants represented that BADGER was "***ready***," "***performing really well***," "***transitioning to production***," and that the SCAR Contract was "***locked in***" and "***ready to scale.***"

6. After Defendants touted SCAR as a "$1.7 billion program" in June 2025, BTIG set a $415 price target citing SCAR as a key growth catalyst, and RBC Capital Markets raised its price target from $200 to $275. After Defendant Clum proclaimed in September 2025 that "***BADGER is ready***," BTIG highlighted that the new fixed-price contract option would "help drive margins up . . . through the balance of FY 2026" and RBC Capital Markets maintained its Outperform rating, noting that it was "impressed with the company's Badger solution." After Defendant Nawabi declared that "***SCAR's a program locked in***," analysts echoed Defendants' assurances that AeroVironment was "on track to deliver its first BADGER antenna over the next several months." And after Defendant Nawabi assured investors in December 2025 that SCAR was "***very much on track***," Piper Sandler reported that SCAR initiatives like BADGER were "moving closer and closer to production." Fueled by these assurances, AeroVironment's stock price traded as high as $409.83 per share during the Class Period.

7. Defendants' representations were materially misleading and omitted necessary facts. In truth, when these statements were made, Defendants knew that BADGER was *not* "ready," the system's ***most important*** component was not functional, the system was not in "production" (indeed, could not be), and no fully functional BADGER units had been delivered or could be delivered on the timeline required by the Space Force or in the mere "months" touted by Defendants. Defendants also knew that the SCAR Contract was not remotely "locked in" as termination was looming and the Space Force was actively seeking other bidders. By assuring investors that SCAR was "locked in" and that BADGER was "ready," Defendants represented to investors that these serious risks did not exist—indicating that the technology worked, that the Space Force had no complaints, and that the Space Force was fully committed to the program. The opposite was true. Indeed, Defendants were unambiguously informed that the Space Force was considering alternative vendors and that, in September 2025—less than a week before Defendant Nawabi definitively told investors that "SCAR's a program locked in"—the most senior Air Force contracting executive for the Space Force warned that he would personally see to it that the SCAR Contract was cancelled unless AeroVironment could promptly remediate the situation.

8. Defendants' knowledge is further confirmed by reports from former AeroVironment and BlueHalo employees who worked at the Company at the same time as Defendants. These former employees ("FEs") reported that, during the Class Period, the reality known within the Company but concealed from investors was that the BADGER system was years behind schedule and had yet to resolve intractable technical challenges related to its most critical component, the MSDA tile at the heart of BADGER's radio frequency communication capabilities. These former employees, who worked directly on BADGER and its associated

products, also reported that, by the start of the Class Period, the BADGER technology was deficient, and the SCAR Contract was likely to be terminated.

9. For example, the former Deputy Chief Engineer for the SCAR/BADGER program who worked at BlueHalo and then AeroVironment reported that, by June 2025 (the start of the Class Period), BADGER lacked basic functionality, every meeting between the Company and the Space Force was contentious, and the Space Force threatened to cancel the SCAR Contract. Another former AeroVironment employee reported that Company management was told by their own technical teams that the BADGER timelines were unachievable. She further explained that, by late 2024 or early 2025 (prior to the start of the Class Period), the government was considering diversifying vendors and shutting down BADGER because AeroVironment was not meeting requirements and was even lying about its progress and production timeline. A different former employee confirmed these facts and reported personally attending an all-hands meeting in August/September 2025 that Defendants Nawabi (CEO) and Clum (President of the Space Division) attended—and Nawabi directly addressed the issues that AeroVironment was facing regarding the SCAR program, including by acknowledging that they were likely to lose the contract. Yet another former employee explained that Defendants' statements about being ahead of the competition were not accurate—and further reported that Defendant Clum engaged in systematic retribution for any attempts to correct misrepresentations. According to this former employee, Defendant Clum also used revenues from other products to plug gaps in SCAR revenues and was internally known as 'jazz hands' because of her 'don't look over here, everything is fine' style of leadership. These accounts were provided independently by multiple former BlueHalo and/or AeroVironment employees who had direct experience working on SCAR and BADGER

and with Defendants but in different roles, in different locations, and at different times. So the fact that their reports are consistent provides powerful corroboration and credibility to their accounts.

10. Defendants were highly motivated to misrepresent the status of the SCAR Contract and BADGER's progress, including because they collectively engaged in insider selling to the tune of nearly $6 million worth of their personal AeroVironment stock holdings at inflated prices. CEO Nawabi's insider selling included a particularly suspicious sale of more than $4.5 million worth of AeroVironment stock in a ***single*** transaction outside any 10b5-1 plan less than six weeks after the acquisition of BlueHalo. Defendants were also motivated to avoid—or at least delay as long as possible—having to publicly disclose facts revealing that they had vastly overpaid for BlueHalo in the acquisition.

11. Defendants' scheme to deceive investors unraveled in a devastating series of events. On January 20, 2026—just six weeks after Defendant Nawabi assured investors that SCAR was "very much on track," "transitioning to production," and "performing really well," and after Defendants had lined their own pockets with millions in insider sales—Defendants were forced to reveal that, based on a "mutual agreement," the U.S. government had issued a stop work order for BADGER. In response to this revelation, the price of AeroVironment common stock plummeted nearly $62 per share, or approximately 16% in a single day, on heavy trading volume.

12. The market was stunned. Analysts decried this development as "unexpected" and a "surprise," highlighting Defendants' recent assurances about "new award activity" and BADGER's readiness.

13. However, Defendants assuaged investor concern by claiming that the stop work order resulted in only minor modifications and an insignificant delay, and posed no threat to the $1.7 billion SCAR Contract. For example, Defendants reassured that the stop work order "allows

for the parties to negotiate an amended agreement for the future of the SCAR program" and that "[t]he Company expects to continue to deliver capabilities and products for the SCAR program." Defendants reinforced this message in communications with analysts, telling them that new contract discussions would be "much faster than 90 days" and could "take one month or less." Analysts credited these reassurances—BTIG reported "no permanent scars from SCAR SWO"—and AeroVironment's stock continued to trade at artificially inflated prices.

14. Then, on March 2, 2026, Space News reported that the Space Force was *reopening the SCAR program* and "reassessing how to move forward"—a complete about-face from Defendants' representations that the SCAR Contract was "locked in." Space Force's director of contracting exposed the truth—due to BADGER's ongoing technological limitations, Space Force's new strategy "will likely take the form of other companies building versions or variants of SCAR." In response, the price of AeroVironment common stock continued to tumble, falling nearly $44 per share, or approximately 17%, as many millions of shares were sold in response to the news.

15. Analysts were stunned. Raymond James downgraded AeroVironment from "Strong Buy" to "Underperform." RBC Capital Markets proclaimed that this news "hurt credibility" and urged Defendants to "come clean on the SCAR program implications." However, Defendants again minimized any threat to the SCAR Contract, claiming that AeroVironment was "still on the program," that the Company "still ha[s] a contract," and dismissing the announcement as nothing more than "a little bit of a game [by the military] trying to make us go faster."

16. Just over a week later, on March 10, 2026, Defendants dropped a bombshell—Space Force "concluded to terminate our existing [SCAR] contract." In connection with the disclosure, Defendants were also forced to write down over $151 million in goodwill—conceding

that the carrying value of AeroVironment's Space reporting segment was materially impaired because of the loss of the SCAR/BADGER contract. On this news, AeroVironment's stock price fell almost $14 per share, or approximately 6%, on heavy trading volume. In just three months, AeroVironment's "locked in" $1.7 billion contract had gone from "very much on track" and "ready to scale" to terminated.

17. On June 22, 2026, AeroVironment revealed still more bad news: a financial restatement and the fact that its internal controls had a material weakness related to the value of its Space division. Specifically, the previously reported goodwill impairment associated with the SCAR Contract had been understated by over 59%, or $89.4 million, bringing the total corrected goodwill impairment to over $240 million. The restatement confirmed that the true financial impact of the SCAR-related stop work order was materially greater than Defendants had previously represented—and came just three months after Defendant McDonnell assured that Defendants did "not expect any further adjustments to the impairment." On this news, AeroVironment's stock declined over $18 per share, or approximately 11%, on heavy trading volume.

18. By the end of the Class Period, AeroVironment's stock closed at approximately $151 per share, more than 63% below its $410 per share Class Period high. On the four specific corrective disclosure dates alone, AeroVironment's stock price plummeted a total of 35%, an aggregate decline of $138 per share that erased nearly $7 billion in shareholder value. As of the date of this Complaint, the Company's shares have not recovered ***any*** of the loss.

19. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant losses and damages.

20. Lead Plaintiffs bring this action to recover the damages suffered by Class members, which were caused by Defendants' materially false and misleading statements, omissions, scheme, and/or acts.

## II. JURISDICTION AND VENUE

21. The claims asserted herein arise under and pursuant to Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

23. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). AeroVironment is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

24. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. THE PARTIES

25. Lead Plaintiff City of Miami Fire Fighters' and Police Officers' Retirement Trust ("Miami FIPO") is a public pension fund that provides retirement benefits for firefighters and police officers of Miami, Florida. As of February 19, 2026, Miami FIPO managed approximately $1.9 billion in assets for the benefit of its approximately 4,281 active and retired participants. As set forth in its previously filed Certification (ECF No. 21-1), incorporated by reference herein,

Miami FIPO acquired AeroVironment securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

26. Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Miami Beach ("Miami Beach F&P" and, together with Miami FIPO, the "Florida Funds," or "Lead Plaintiffs") is a pension fund established for the benefit of current and retired firefighters and police officers of the City of Miami Beach, Florida. As of February 19, 2026, Miami Beach F&P managed approximately $1.3 billion in net assets on behalf of over 1,300 active and retired participants. As set forth in its previously filed Certification (ECF No. 21-1), incorporated by reference herein, Miami Beach F&P acquired AeroVironment securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

27. Defendant AeroVironment, Inc. ("AeroVironment" or the "Company"), a defense contractor, is a Delaware corporation with principal executive offices located at 241 18th Street South, Suite 650, Arlington, Virginia 22202. AeroVironment's common stock trades in an efficient market on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "AVAV."

28. Defendant Wahid Nawabi ("Nawabi") served as AeroVironment's President and Chief Executive Officer at all relevant times. Nawabi has also served as Chairman of the Company's Board of Directors at all relevant times. As set forth below in Section V, during the Class Period, Nawabi made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made not misleading.

29. Defendant Kevin P. McDonnell ("McDonnell") served as AeroVironment's Chief Financial Officer ("CFO") at all relevant times. As set forth below in Section V, during the Class Period, McDonnell made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made not misleading.

30. Defendant Mary Clum ("Clum") served as President of AeroVironment's Space, Cyber & Directed Energy business segment from October 2025 through the end of the Class Period. Previously, Defendant Clum was the Executive Vice President for AeroVironment's Space and Directed Energy Group (until October 24, 2025) and, prior to that, was President of BlueHalo's Product and Space Systems portfolio. As set forth below in Section V, during the Class Period, Clum made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made not misleading.

31. Defendants Nawabi, McDonnell, and Clum are collectively referred to herein as the "Executive Defendants." The Executive Defendants directly participated in the management of AeroVironment's operations, had direct supervisory involvement in AeroVironment's day-to-day operations, and had the ability to control, and did control, the Company's statements to investors and financial reporting. The Executive Defendants possessed the power and authority to control the contents of AeroVironment's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Because of their positions and access to material non-public information available to them, each of the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Executive Defendants were involved in drafting, reviewing, publishing, disseminating, authorizing, and making the false and misleading statements and omissions alleged herein.

32. AeroVironment is liable for the acts of the Executive Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful

acts complained of herein were carried out within the scope of their employment with authorization.

## IV. OVERVIEW OF DEFENDANTS' DECEPTION OF INVESTORS

### A. AeroVironment Pays $3.5 Billion To Acquire BlueHalo And Its SCAR Contract

33. AeroVironment is a defense technology company headquartered in Arlington, Virginia that designs, develops, produces, and delivers robotic systems and related services for government agencies and businesses. AeroVironment predominantly supplies unmanned aircraft systems such as drones and tactical missile systems, uncrewed ground vehicles, and related services to the U.S. Department of Defense ("DoD"), other federal agencies, and allied governments.

34. The U.S. government is by far AeroVironment's most important customer. In its 2025 10-K, AeroVironment reported that it earned just over $613 million from U.S. government contracts for the fiscal year ended April 30, 2025, or about 75% of the Company's revenue that year. In fiscal year 2026, that figure grew to $1.68 billion, or about 85% of the Company's revenue. The Company sells a majority of its products to the DoD, including the U.S. Army, Marine Corps, Special Operations Command, Air Force, Navy, Space Force, and Cyber Command.

35. On November 19, 2024, AeroVironment announced that it would acquire BlueHalo, a defense technology company, in an all-stock transaction valued at approximately $3.5 billion at closing. On May 1, 2025, the first day of AeroVironment's 2026 fiscal calendar year, AeroVironment announced that it had completed the acquisition. The BlueHalo acquisition was the largest merger and acquisition ("M&A") transaction in Company history. By comparison, the next largest M&A deal in AeroVironment's 55-year history was its acquisition of Arcturus UAV, Inc. for approximately $405 million, less than one-eighth the size of the BlueHalo acquisition.

36. AeroVironment paid a steep price for BlueHalo. Under the acquisition method of accounting (ASC 805), AeroVironment recognized the identifiable assets acquired and liabilities assumed at their acquisition-date fair values. Everything else went to goodwill—a "catchall" residual that represents the excess of the purchase price over the fair value of the identifiable net assets acquired. In other words, AeroVironment paid $3.5 billion to acquire approximately $1.2 billion in identifiable net assets, and attributed the remaining $2.3 billion of the purchase price—or 65.5%—to goodwill.

### B. <u>The SCAR Contract Was The Key To AeroVironment's Growth And The Justification For The Steep BlueHalo Price Tag</u>

37. The principal asset AeroVironment acquired in the BlueHalo deal was the SCAR Contract. On May 21, 2022, the Space Rapid Capabilities Office ("Space RCO") competitively awarded BlueHalo an Other Transaction Agreement ("OTA") for the SCAR program for $1.4 billion. The SCAR program was designed to address the U.S. Space Command's requirement to "rapidly, responsively and affordably" augment satellite control capacity by providing more control links to Space Force satellites. The contract covered delivery of up to 12 of BlueHalo's BADGER ground system units. According to AeroVironment, the value of the eight-year SCAR Contract was $1.7 billion.

38. An OTA is a flexible contracting vehicle, exempt from the rigid rules of the Federal Acquisition Regulation, that the government uses to rapidly fund the research, development, prototyping, and production of urgently needed technologies. Critically, if a company *successfully* completes prototyping under an OTA, the government may transition straight into follow-on production *without* reopening the project to competitive bidding. Thus, so long as BADGER performed, the SCAR Contract offered AeroVironment a path to years of production revenue free from competition.

39. The BADGER system is a modular, software-defined digital phased array antenna that was supposed to modernize the Space Force's aging Satellite Control Network. According to AeroVironment, unlike traditional parabolic antennas that can only communicate with one satellite at a time, a single BADGER terminal was supposed to maintain concurrent contact with up to 20 satellites. Key to this purported capability were BADGER's proprietary "MSDA" (Multi-band/beam Software Defined Antenna) tiles—the building blocks of the array which were themselves composed of over 200 radio frequency transmitters and the means by which BADGER communicated with satellites. A single BADGER was made up of 160 MSDA tiles. AeroVironment's related WASP system, a "derivative of BADGER," applied the same MSDA technology to existing parabolic satellite dishes.[1]

40. The SCAR Contract was AeroVironment's single most important contract with its most important customer, the U.S. government's Space Force. It was the Company's largest contract, representing approximately 37% of AeroVironment's total backlog. Defendant Nawabi personally identified "[s]pace communication – SCAR and BADGER terminals" as a "$1 billion+" franchise on his list of the Company's top priorities. And the SCAR Contract was the linchpin of the BlueHalo acquisition. As JPMorgan explained, "investors have viewed SCAR as a top [AeroVironment] growth driver and a justification for last year's $4b BlueHalo acquisition." Other analysts called SCAR "the jewel of the SCDE segment"—AeroVironment's Space, Cyber & Directed Energy business segment.

41. Given its importance, Defendants discussed the SCAR Contract at length on every earnings call and at investor conferences throughout the Class Period. The market, in turn, was

---

[1] Both platforms run on the same "brain" (software-defined RF beamforming), but BADGER deploys it onto an all-electronic flat panel while WASP scales it down to feed into traditional satellite dishes.

laser-focused on the SCAR Contract. Analysts repeatedly cited SCAR as a key growth catalyst in setting their ratings and price targets for AeroVironment stock, and they relied on Defendants—through "our conversations with management," "a discussion with management," and non-deal roadshows with Defendant McDonnell—for updates on the critical program. Accordingly, both Defendants and the market understood that the status and value of the SCAR Contract were critical to AeroVironment's growth and stock price.

### C. Throughout The Class Period, Defendants Repeatedly Assured Investors That The SCAR Contract Was "Locked In" And BADGER Was "Ready To Scale"

42. From the start of the Class Period, Defendants told investors that SCAR was a secure, locked in, fully-funded $1.7 billion program that AeroVironment was ready to perform and ready to scale. Defendants understood that the key question for investors was the degree to which the Company would be able to exploit its position as the government's provider of the SCAR system. Like all of AeroVironment's government contracts, the SCAR Contract "could" be terminated by the government "for convenience," which Defendants misleadingly cited as a hypothetical risk in AeroVironment's SEC filings. Thus, the value of the SCAR Contract to AeroVironment and its shareholders depended heavily on two things: whether BADGER actually worked, and whether the Space Force was satisfied with AeroVironment's performance. Throughout the Class Period, Defendants repeatedly assured investors that there were no problems on either front—and concealed the fact that there were in fact grave problems on both fronts. Indeed, Defendants told investors definitively that BADGER was "ready," "ready to scale," that the Space Force had an "urgent demand" for more systems and was "asking for more," and—in Defendant Nawabi's own words—that SCAR was "locked in." In context, these statements conveyed that the Space Force was satisfied with BADGER and AeroVironment's performance under the SCAR Contract, had raised no complaints or concerns about either the technology or

AeroVironment's performance, and the SCAR Contract was proceeding well and the Space Force was fully committed to the program, such that the government's right to terminate for convenience posed only a hypothetical risk—and was not a realistic threat.

43. The Class Period begins on June 25, 2025, the day after AeroVironment held its fourth quarter fiscal 2025 earnings call—the Company's first earnings call since closing the BlueHalo acquisition. During the call, Defendant Nawabi (CEO) told investors that SCAR was one of ***"several very serious, large growth potential opportunities in front of us," that the SCAR Contract was "worth about a 1.7 billion program funded through the Congressional budget documents," and that—without qualification—"[w]e can scale that and expedite deliveries in the fiscal year 2026 and beyond*.***"**

44. Analysts embraced and applauded Defendants' positive statements. For example, BTIG cited the SCAR program as a key growth catalyst when it set a price target of $415 per share for AeroVironment. RBC Capital Markets maintained its "Outperform" rating and increased its price target from $200 to $275, highlighting that "management has also discussed their opportunity for the SCAR program (via the BADGER solution) as being as much as $1.4B - $1.7B in awards."

45. Over the ensuing months, Defendants intensified their promotion of SCAR, the BADGER technology, and the Company's ability to capitalize on the $1.7 billion SCAR Contract. On September 9, 2025, during AeroVironment's first quarter fiscal 2026 earnings call, Defendant Nawabi (CEO) touted a $70 million award for additional BADGER units, which he described as "part of a larger order we expect to receive in Q2." On September 17, 2025, at the RBC Industrials Conference, Nawabi told investors that the Space Force was upgrading "the entire Department of Defense's geosynchronous satellites RF communication with our phased array SCAR," that "***it's***

***a $1.7 billion program that we won against the major primes***," and that it "***is going to be produced this year***."

46. Defendants' assurances grew even more specific. Two days later, on September 19, 2025, AeroVironment issued a press release announcing its "first FFP [firm-fixed-price] contract option for BADGER." The press release specified that BADGER's development was essentially complete and that production and deliveries were imminent, which would boost the Company's margins. For example, the release stated that "***most key development milestones for the SCAR program have already been completed***" and that AeroVironment "***will deliver the first BADGER unit to the Space Force in the coming months, with more units nearing completion for delivery in early 2026 to support full-scale overseas deployment***." Defendant Clum assured investors that there was "***urgent demand for SCAR*** [ ] backed by a universal recognition of the expansive satellite tracking, telemetry, and control capabilities ***[AeroVironment] will soon deliver to the Space Force***." And Clum proclaimed: "***With the technology ready to scale***, we have accelerated production and strengthened our supply chain to meet the demand. ***BADGER is ready. SCAR is coming***."

47. These statements were critical to investors. Because the Space Force could terminate the SCAR Contract for convenience at any time, the most significant risk to the program was that BADGER would fail to perform or that the Space Force would lose confidence in AeroVironment. The September 19 press release told investors that these risks were merely hypothetical, including because the Company's BADGER technology was "ready to scale," its "key development milestones" were largely complete, production had "accelerated," and the Space Force was so satisfied that it had exercised a new firm-fixed-price option and had an "urgent demand" for more. In other words, Defendants were telling investors not to worry about the

government's right to terminate—the Space Force was not only fully satisfied with BADGER, it wanted more BADGERs and wanted them fast. In Defendants' own words, SCAR was "locked in."

48. On September 30, 2025, at AeroVironment's Investor Open House, Defendants doubled down. Defendant Nawabi declared that "***SCAR's a program locked in***, in a very high barrier to entry market. [B]ut our team did it," and that "***SCAR and our BADGER space comms is really key. That's a $1 billion franchise***." Defendant Clum added that SCAR was an "***awarded value of $1.7 billion, extending all the way through . . . 2030***," that the SCAR "solution" was "***in very high demand with the Space Force***," that "***the customer is asking for more***," and that "***we're ready to scale***" and "***we're ready to build more***." Clum told investors that AeroVironment's team was "***shoulder to shoulder with the customer***," and quoted Dr. Kelly Hammett, the former Director of the Space RCO, as telling AeroVironment that "***we're going to need a bunch of SCARs, and we're going to need them fast as we can make them***."

49. Coming on the heels of the September 19 press release, Defendant Nawabi's assurance that SCAR was "locked in" meant exactly what it said: notwithstanding the government's right to terminate, the Space Force was fully committed to AeroVironment and BADGER, and there were no technical problems or customer concerns that threatened the SCAR Contract. Analysts understood Defendants' statements the same way. Following the event and a conversation with Defendants Nawabi and McDonnell, William Blair reported that "AV is on track to deliver its first BADGER antenna over the next several months." RBC Capital Markets maintained its "Outperform" rating, noting that it was "impressed with the company's Badger solution."

50. As 2025 drew to a close, Defendants emphasized that the Company was shifting from development to delivery under the SCAR Contract, and was scaling BADGER units. For example, on December 3, 2025, at the Goldman Sachs Industrials and Materials Conference, Defendant Nawabi identified SCAR as a program "that's going to contribute to the growth" of AeroVironment, describing it as "***$1.7 billion worth of funding that's going to be put into that to modernize the entire U.S. space satellite, geosynchronous satellites with our systems phased arrays***."

51. Six days later, on December 9, 2025, during AeroVironment's second quarter fiscal 2026 earnings call, Nawabi assured investors that the SCAR program was "***shifting now from development activity to delivering products***," was "***transitioning to production***," and that "***we're just beginning to deliver systems . . . our system is performing really well***." Nawabi further assured that the "***U.S. DoD needs [the contracts] desperately***," that "***we're pleased with the performance so far***," that SCAR "***represents a tremendous growth opportunity for [AeroVironment] as more BADGER systems move into production***," that the transition to delivering products "improves the margin profile of that business," and that "***[w]e're very much on track with our plans***."

52. Analysts again accepted these representations at face value. Piper Sandler highlighted that "industry tailwinds appear strong with SCAR initiatives like Badger moving closer and closer to production," and Citizens JMP Securities incorporated Defendants' representations that the SCAR program provided a dependable and growing source of revenue for AeroVironment.

53. Fueled by Defendants' repeated assurances about the status, readiness, and value of the SCAR Contract, AeroVironment's stock price traded as high as $409.83 per share during

the Class Period. Defendants Nawabi and McDonnell took full advantage of the inflated price, selling millions of dollars of their personal AeroVironment stock—including Nawabi's $4.5 million sale on July 16, 2025 at a weighted average price of $263.05 per share, which was not made pursuant to a Rule 10b5-1 trading plan and was Nawabi's first sale in over a year. *See infra* Section VI.

54. Unbeknownst to investors, however, Defendants' statements were materially false and misleading, and omitted critical facts necessary to make them not misleading. Indeed, BADGER was not even close to "ready," and rather than the SCAR Contract being "locked in," in reality the government had unequivocally and repeatedly told AeroVironment that the contract would be ***terminated*** if BADGER's performance did not ***dramatically*** improve. And far from being ready to scale, the truth was that BADGER's MSDA tile—the most important component of the entire system—had gone through at least four redesigns and still could not operate as required. In February 2025, the Space RCO had issued a formal Request for Information seeking industry information on phased array antenna technology that directly overlapped with BADGER. In March 2025, Major General Stephen Purdy, who led Space Force procurement, privately threatened cancellation of the entire program.

55. Further, by August/September 2025, Defendant Nawabi had personally convened an all-hands meeting, attended by Defendant Clum, at which Nawabi internally acknowledged that the Space Force was unsatisfied with AeroVironment's performance under the SCAR Contract and that senior management was trying to rebuild trust because they knew the Company was likely to lose the customer (Space Force) and the entire SCAR Contract.

56. And at the September 22-24, 2025 Air Force Conference—just days after Defendants proclaimed that "BADGER is ready," and less than a week before they told investors

that SCAR was "locked in"—the most senior Air Force contracting executive again personally warned AeroVironment that it needed to get it together or he would personally see to it that the SCAR Contract was cancelled. Even the September 2025 conversion of the SCAR Contract to a fixed-price arrangement, which Defendants presented to investors as a milestone, occurred *because* the Space Force had lost faith in AeroVironment and refused to fund further development costs. *See infra* Section IV.D.

### D. <u>Reports From Former AeroVironment Employees Confirm That Defendants Knowingly Misled Investors About The Status, Progress, And Value Of The SCAR Program/BADGER Contract</u>

57. As detailed herein, multiple former BlueHalo and/or AeroVironment employees reported that the reality known within the Company—but unbeknownst to investors—was that BADGER was not functional, years behind schedule, and had yet to resolve intractable technical challenges related to its most critical component, the MSDA tile technology at the heart of BADGER's radio communication capabilities. Specifically, these former employees reported that (i) AeroVironment's management was repeatedly told by the Company's technical teams for BADGER that its timelines were unachievable; (ii) the Company presented false and misleading data and concealed major design revisions from the Space Force to conceal the true state of BADGER's development and capabilities in order to continue receiving development funding under the contract, including hypothetical projections rather than actual test results; (iii) in March, May, and again in September 2025, the Space Force had grown so dissatisfied with BADGER's lack of progress that two separate senior contracting executives personally warned AeroVironment that the contract would be cancelled if the Company did not correct course; (iv) the BADGER contract was converted from an OTA to a fixed-price contract in September 2025 *because* the Space Force had lost faith in AeroVironment and refused to fund further research needed to get the technology working; and (v) Defendant Clum and CEO Nawabi were directly aware of

BADGER's failures, with Nawabi and Clum personally attending corrective action meetings and convening an all-hands meeting around August/September 2025 to address the crisis and acknowledge that the Company was at risk of losing its customer. These former employee reports were provided independently by multiple individuals who had direct experience working at AeroVironment, on SCAR and BADGER specifically, in different roles, in different locations, and at different times—but their reports are strikingly consistent and, thus, mutually corroborating.

58. ***Former AeroVironment Employee #1 ("FE1").***[2] FE1 was the former Deputy Chief Engineer for the SCAR program at BlueHalo from January 2025 through August 2025, a period spanning AeroVironment's May 1, 2025 acquisition of BlueHalo. FE1's role was to attempt to mature BADGER into a functional and testable system. Specifically, FE1 was the former Deputy Chief Engineer for AITC,[3] and worked with the group that verified requirements and performed functional checks, including testing and developing an integration acceptance plan for the BADGER system. FE1 reported to Michael Pace, the Vice President of the division group, who held the patent for BADGER's antenna element, and worked directly with BADGER's Chief Engineer, Jordan Klepper. FE1 also attended meetings with the Space Force's program manager and its system engineering lead.

59. FE1 reported that the Company made misleading statements about BADGER's technical maturity, completely overstated its functionality and capabilities, and put optimistic timelines on its readiness and availability. According to FE1, in April 2025, a research institute in New Mexico was working with the Air Force on a review of BADGER's antenna array and concluded that it worked as a prototype but was ***not ready for deployment or production***. FE1 said

---

[2] All FEs are referred to herein using feminine pronouns—regardless of their actual gender—in order to preserve the confidentiality of their identities and personal information.

[3] AITC refers to acceptance, integration, test, and certification.

this caused significant issues because, under the OTA structure, the customer had immediate input from a test that showed the immaturity of the design. FE1 also said that, around May or June 2025, the BADGER team ran a test in which a four-element antenna array mounted on a cart was used to detect XM satellites, which are geostationary satellites broadcasting at a fixed frequency. After the test, Pace told FE1 and other team members, "Wow, this is the first time we've ever been able to do it." The problem, however, was that 14 months earlier, the Company had broadcast that it had already been able to do this, and it had sold the program to the customer—the Rapid Capabilities Office at Kirtland Air Force Base—claiming it could do the same thing with 100% accuracy. FE1 stated that this 100% accuracy claim was very misleading and a misrepresentation of the technical maturity of the product. According to FE1, the previous generation tiles could not achieve this very basic tracking, which is one of the very first tests done to verify that a satellite command and control system can see an object in the sky, *i.e.*, track a satellite. Indeed, during FE1's interview process, she was told this capability had already been demonstrated, but once she was employed, the team described the test as the first time it had been seen—and when this discrepancy was raised to Pace, he gave a look and ignored it, conveying "don't question what I say."

60. According to FE1, the XM test was intended to validate that the system could see an object in the sky, and the system operated at low power in receiving mode only. The team was not able to communicate with the satellite, or to link to and decode its signal; it simply knew that the satellite was at a particular position broadcasting at a particular frequency. FE1 explained that this receive capability is commercially very well characterized and well understood—cars have XM systems with an antenna element on the car—and that the test should have been done very early on in the program, not at that stage. Thus, by the start of the Class Period, according to FE1,

the test demonstrated only very basic, base-level functions. Major General Purdy, whose group wanted to see a demonstration of technical maturity, drove the test and came to the facility to witness the demonstration of the test.

61. FE1 reported that Defendant Nawabi came to New Mexico during the acquisition, was introduced by Defendant Clum and Pace and "read in," and spent several weeks there meeting with the customer. Together with Clum and Pace, Nawabi met with the customer at the customer's facility and participated in several customer meetings and maturity-level discussions, and ***Nawabi was aware of the growing concerns and "displeasure with communication" that the customer had***. Nawabi also sat through several long days of discussions, from 7:00 a.m. to 8:00 p.m., regarding the status of BlueHalo's operations in Albuquerque, where SCAR had its own building and was the largest contract by sticker price. In addition, Nawabi and Pace had daily meetings at BlueHalo's facility, and Nawabi knew of the corrective action plan that the customer and BlueHalo were working on because it was discussed during those meetings. Pace, Clum, and Nawabi also traveled to California to meet with other manufacturers, and then to the East Coast for discussions with suppliers and manufacturers of elements within the system; in California, a group within AeroVironment that manufactured antenna elements and high-performance RF systems was going to come in and help FE1's group, but the assistance never materialized. According to FE1, the relationship with the customer was in an aggressive communication pattern.

62. FE1 reported that, during the acquisition phase, there was concern regarding the issues with the BADGER program, and the customer felt BlueHalo needed to provide further details and test results to continue. There were several discussions, held in a classified environment, about the BADGER program's lack of progress since prior design reviews, and the customer's concern grew to the point that it demanded BlueHalo prove the work was actually being

done. FE1 described a 'put up or shut up' moment in or around April 2025, when the team had to show the customer that it understood the critical nature of the design and the production ramp-up, and the customer was eliminating any excuses for missing critical delivery dates. Then, in or around late May or early June 2025, shortly before a classified meeting, the local representative from the Space RCO and senior acquisition manager stated: 'Tell me why right now I shouldn't cancel this f*cking contract.' FE1 stated that it was the first time she had heard those words uttered about a contract of that size and scope, and that senior acquisition managers do not make such statements lightly. The statement led to a corrective action plan, which the BlueHalo group was left to write, and Klepper, Pace, Clum, and all of the senior engineering leads were "destroyed" by the customer.

63. FE1 said that, as part of that effort, the customer demanded that the team rewrite the system-level requirements that had been developed at the beginning of the program. According to FE1, the customer (Space Force) said that what the Company had delivered did not work, called it "trash," and said that all of the requirements needed to be rewritten. FE1 and other engineers—34 people in total—spent a week in a conference room with the customer rewriting the requirements, including the A-level requirements that define the system, its power requirements, and its operations. According to FE1, having to rewrite the requirements two years into the program, because the customer did not believe the team could deliver what it had been working on for those two years, was the final straw. FE1 heard that, after her departure, the requirements were rewritten again in approximately the late August/early September and December timeframes.

64. FE1 further reported that the message to the customer was shaped and the customer was not given all the information, and that, at every opportunity, FE1 was met with pushback on how the program was spoken about and represented to customers. According to FE1, data was

cited from undocumented and unverified sources, and performance gains and behaviors were overstated in meetings, leading the customer to issue a warning and push the program into formal critical design review and corrective action mechanisms. For instance, Klepper made statements during a classified critical design review meeting, and, separately, Pace presented information in a discussion that was not accurate and later walked those statements back, after which the customer instructed that no statements on performance be made unless documented in the critical design review deck. FE1 also reported that a previous demonstration had supposedly shown the same XM result, but the data had been fed from a different antenna element and presented as real-time data when it was not, although FE1 was not present for that demonstration. FE1 described the team changing setups to make the results more presentable, and reported that employees who questioned program leadership about using bad data were marked as undesirables and received an HR action—indeed, many employees were put on performance improvement plans, and Pace placed FE1 on one.

65. According to FE1, Sierra Jarrett and her deputy were actively working on repricing the contract, which required changing the contract type to fixed price, and Clum, Pace, and Jarrett—Clum being Pace's supervisor—were actively working on the rebid. FE1 explained that this type of rebidding and government action signals that the government either does not want your product or does not trust you, and that it reflected the government's recognition of the risk involved in proceeding with the existing design. In May or June 2025, the customer further stated that it would no longer absorb one-time engineering costs, corrective action, or redevelopment costs for components previously labeled as complete, such that anything FE1's group was correcting at that time would no longer be bid into the system.

66. FE1 also recounted the first high-power transmit test of BADGER's antenna element, which occurred in approximately June 2025. FE1 explained that power is applied to BADGER's FPGAs, which are connected to GPUs for co-processing, and that the system worked when receiving because it was operating in low-power mode. The first time the system was switched to a high-power transmit beam, however, the power and heat burned up and fried the front-end assembly connected to the antenna element, resulting in a complete failure of the antenna element, causing the team to redesign the entire printed circuit board ("PCB") for the antenna element. And when the team attempted to transmit in a controlled environment at only one-quarter of the power the actual test would require, the transmission burned up the back end of every antenna element on the tile.

67. FE1 reported that there was a lack of transparency about the MSDA tile's maturity, and that the PCB and FPGA integration work was kept very close to the chest while the team tried to show progress in maturing the design. FE1 confirmed that this was done because the customer would not pay for any revision past revision two, and AeroVironment would have to absorb those costs. Promises had been made about going from version one to two and from two to three, with version three to be the production-ready system incorporating the lessons from versions one and two. The design went through incremental revisions—3.1, 3.2, up to 3.3—but these were effectively massive revisions, and in version 3.3 the team discovered that the tile could not transmit with the current layout, which had started burning out antenna elements. Given these known design problems, the antenna element could not handle the operational power levels for the system the Company was trying to produce and had committed to under the contract.

68. According to FE1, although the Company could detect a single signal source at a fixed amplitude (the XM satellite test), with corroboration from a nearby antenna element, no other

subsystem tests had been successfully conducted by the time FE1 left in August 2025. FE1 explained that BADGER could perform certain low-power testing and get certain aspects of the array to work, but it could not even function at base level, could not transmit to establish a communication link, and—given the tiles' inability to transmit at high power—would never be able to establish uplink command of satellites. The MSDA tile element and phased array element were not technically mature enough to make the system functional, and every subsystem within the design had problems. Manufacturing was also subcontracted to two manufacturers who had significant issues with board failures.

69. Nevertheless, the Company was promising high-power operations to the Space Force. FE1 explained that if a system could not operate at low power in all states, it simply could not achieve high-power operations, and that this came down to the maturity of the design at the heart of BADGER. According to FE1, the design was not technically mature but was represented as ready for manufacturing, and the Company never achieved many of the things it claimed to have achieved or had promised the Space Force during FE1's tenure. FE1 explained that the Company was selling off technical maturity as if it were ready for primetime when it had not even reached the operational test state—like claiming an ability to run a marathon before knowing how to stand up or walk. Despite this, AeroVironment executives sold off the system as functional.

70. FE1 further reported that Pace recently announced that he was leaving AeroVironment.

71. ***Former AeroVironment Employee #2 ("FE2").*** FE2 worked as an Engineer at AeroVironment and on BADGER from 2023 to September 2025. FE2 worked closely with the BADGER software, mechanical, and radio frequency teams.

72. FE2 explained that BADGER's MSDA tile was not iterated appropriately and did not follow standard engineering development processes FE2 relayed that Michael Pace, who was in charge of BADGER and reported directly to Defendant Clum (President of the Company's Space division), pressured BADGER engineers to get the program done on completely unrealistic timelines that were beyond their capabilities. Despite being told by BADGER's technical teams that the timelines made no sense, the Company and Pace still told the Space Force that everything was going well and on schedule, or just a few weeks from being completed. Instead, according to FE2, the engineering team repeatedly told Pace that BADGER technology and its MSDA tile were simply not ready and questioned why Pace told the Space Force otherwise. Pace ignored actual test data and instead presented hypothetical projections to the Space Force to support his false narrative that BADGER would imminently be ready for production. FE2 emphasized that the Company told the Space Force that it was further ahead than where it actually was in terms of developing BADGER and its technology.

73. FE2 said that in late 2024 or early 2025, she learned that the Department of Defense was considering diversifying vendors and shutting down BADGER because the Company was not meeting requirements and lying about its progress and production timeline. FE2 said she learned this information from members of BADGER's mechanical team, including Justin Fleming, who was a mechanical engineer, who heard these details from upper management. These conversations regarding diversifying vendors and the programs not meeting requirements started prior to the acquisition of BlueHalo and continued through the acquisition until FE2's departure. During that time, the Space Force put out a Request for Information covering BADGER's capabilities.

74. According to FE2, from an engineering perspective, the team faced roadblocks and gaps. BADGER's technical challenges were due to the poor radio frequency board design. FE2

reported that the specs would not work and, thus, the MSDA tile at the heart of BADGER was in a constant state of design and redesign. For instance, she said that the engineering team got the L and C bands to work, but the S band was much harder. So they were able to get part of the system (MSDA tile) working, but not all three bands, as required to meet the Space Force's requirements to track and communicate with different types of satellites in all orbits.

75. According to FE2, the radio frequency team would get put on a critical pass and only allowed to work on one specific problem unrelated to the tile design. The tiles went through at least four redesigns, none of which fixed the issues that prevented the tile from working. Thus, according to FE2, BADGER's MSDA tile, the most important component of the whole system, was ***not ready to scale***. In addition, the RF technology was not mature or developed enough to provide a working BADGER unit. According to FE2, Pace knew this but told the Space Force that it was.

76. FE2 reported that the change to the fixed price contract occurred because the Space Force began looking for other vendors when they realized that AeroVironment couldn't meet their needs. FE2 said it was very hard to trick the government as the Department of Defense would conduct a "sniff check" to determine whether the Company was lying about their capabilities, saying programs were better than they were. The BADGER system was not performing as planned but the Company provided customers with inaccurate data to cover it up. For instance, FE2 was present in a meeting (after the acquisition by AeroVironment) with a Space Force representative where Pace relayed values regarding BADGER that were not true to make the program look more advanced than it was at the time. FE2 and the radio frequency team wondered where those values came from because they were not internally consistent or based on actual BADGER data that the team had. FE2 confronted Pace to ask where he had sourced those values from as they were not

consistent nor appropriate to present when the team had accurate values based on actual BADGER test data. There were meetings with Space Force prior to, during, and after the acquisition.

77. According to FE2, it was obvious that BADGER was going to be shut down for not meeting core technical requirements and because its delivery timeline extended beyond what had been communicated to the Space Force. The Company had told the Space Force that it could complete it in two years but they were already in year three. The Company was not capable of meeting the committed timeline. FE2 said through her tenure the technology just was not there yet and they faced technical challenges that could not be overcome without more time.

78. ***Former AeroVironment Employee #3 ("FE3").*** FE3 worked as a Senior Mechanical Engineer on BADGER at AeroVironment for approximately one year from May 2025 to May 2026. As Senior Mechanical Engineer on BADGER, she raised concerns about design issues.

79. For instance, BADGER used screws that should not have been used and were likely to fail or were already on the verge of failure, which would allow the MSDA tiles to "pop off." FE3 presented the issue to Klepper, who instructed FE3 to put it in her back pocket for a "design bounty." FE3 had never heard of a design bounty and did not understand why the Company did not want to do it correctly the first time.

80. According to FE3, the RF team was unable to get everything working with respect to the core of the BADGER technology. While things were making sense in simulation, they could not translate those results to hardware. The largest BADGER system FE3 saw was half of what it was supposed to be, but none of it was working. The Company had not completed a full BADGER system that was running during her tenure. According to FE3, the technology had not yet been

proven and, despite working with two contracted manufacturers, the MSDA tiles were not working due to technical issues.

81. According to FE3, there was no internal data supporting that the SCAR Contract was "locked in" and "ready to scale." FE3 recalled that around January 2026, Defendant Nawabi (CEO), Defendant Clum (President of the Space Division), Michael Pace, and several product managers met with the BADGER team to announce the Company was not meeting contract requirements. As a result, the Company planned to transition to internal research and development, build the product internally, prove it out, and then sell it. This discussion was combined with a meeting about restructuring the RF and Space departments at the New Mexico site.

82. FE3 explained that there was no basis for the statement that, after the stop work order, the Company expected to deliver capabilities and products for the SCAR program.

83. ***Former AeroVironment Employee #4 ("FE4").*** FE4 worked as the Program Manager for BlueHalo and then AeroVironment from March 2024 through March 2026. FE4 worked out of BlueHalo's/AV's Albuquerque, New Mexico facility with approximately 20 people on her team. FE4 and her team were responsible for the WASP Program, which was the little brother to the BADGER program and used the same MSDA tiles as BADGER. FE4's job was to manage the life cycle of the project from prototype to production. FE4 reported to Principal Product Manager Sierra Jarret, who was also the Product Manager for BADGER. FE4 reported that most of the employees at the Albuquerque facility were focused on the SCAR program.

84. FE4 reported that by August/September 2025, things were out of hand with the SCAR and WASP programs. FE4 explained that the Company faced financial issues with the way the contract was being managed, AeroVironment failed to set the right expectations with the military, who was dissatisfied with the overall performance of WASP and BADGER and progress.

FE4 said she was aware of Space Force's specific performance concerns by, among other things, her personal attendance at an all hands meeting that was called by the CEO, Wahid Nawabi, which to the best of her recollection occurred in August/September of 2025. According to FE4, Nawabi personally flew down to conduct the all-hands meeting, which included everyone from division manager up. Also in attendance was Defendant Clum. FE4 stated that the meeting was called to discuss progress updates across all of the departments in the facility. There were close to 100 people in attendance in his building's large conference room.

85. FE4 reported that, at this meeting and after each of the VPs presented their updates, Nawabi himself directly addressed the issues AeroVironment was facing regarding the SCAR program. According to FE4, Nawabi informed everyone in that meeting that the Space Force was not happy with AeroVironment, and he mentioned a few possibilities as to why. FE4 recounted that Nawabi stated that the senior executive team, himself (Nawabi) included, was trying to rebuild trust with the Space Force because they knew they were likely to lose the customer and the contract. According to FE4, AeroVironment was trying everything in their power not to lose the customer, and further said that people started to freak out internally.

86. FE4 stated the problems with the Space Force existed because AeroVironment was not adhering to the schedule, and BlueHalo was over budget. FE4 had visibility into BADGER and the SCAR program because her WASP program had a lot of overlap with BADGER, the programs shared resources, and WASP faced similar problems between May and August 2025. FE4 explained, 'If I had issues, I knew BADGER was having issues.'

87. FE4 reported that the BADGER team ran into technical radio frequency issues. FE4 stated while the team was struggling to overcome these technical issues, executive management at AeroVironment nevertheless continued to give the government impossible dates for project

milestones. According to FE4, management was telling the U.S. Space Force that the problems that were being encountered would be solved by the next week, and week after week they would keep pushing back the timeline. The additional challenge with the specific RF issues was that not a lot of people had experience dealing with it.

88. FE4 commented the contract change from an OTA to a fixed-price contract occurred because the customer had lost faith in AV.

89. ***Former AeroVironment Employee #5 ("FE5").*** FE5 worked as a Senior Director, Business Development at AeroVironment from October 2023 to November 2025. FE5 was the lead for the large annual Air Force Conference which took place in National Harbor from September 22-24, 2025. During the conference, the most senior Air Force contracting executive came over to the booth specifically to say that he wanted it to be reported to AeroVironment's senior leadership that the Company needed to get it together or he would personally see to it that the SCAR Contract was cancelled. According to FE5, when the senior contracting executive stopped by the booth, it was an indication that the house was on fire. FE5 said it was a 'get your sh*t together or else, the contract would be cancelled' situation.

90. FE5 further explained that when it comes to how the Air Force and Space Force spend money and secure contracts, the contracting executive holds the ultimate decision-making role and, from FE5's perspective, there was no one higher except the Secretary of the Air Force. Thus, FE5 said it was a doomsday scenario that the contracting executive came to the AeroVironment booth to relay these concerns. She immediately made sure that her leadership knew about the dire interaction by communicating it to Church Hutton, the Chief Growth Officer. Hutton informed FE5 that he was going to call Clum, and specifically told FE5 to not tell anyone what had happened.

91. With respect to the RFIs issued on February 26, 2025, FE5 explained that if there is an existing contract and the government issues an RFI covering that contract, then it was understood within AeroVironment that it was most probably already decided by the Department of Defense and Space Force that the Company was on its way out. While it is conceivable that the Department of Defense might accept a recompete proposal, it is unlikely, and the probability of winning would be low because of the Company's prior performance failures.

92. As to the Company's tracking of RFIs, FE5 explained that one of the foundational jobs within AeroVironment was to track and report about updates that the government reported out within the Company's capabilities. In other words, according to FE5, someone within AeroVironment was responsible for seeing an RFI go out, and that person's job was to notify leadership. According to FE5, Nawabi stressed in meetings and emails the importance of internal reporting of RFIs.

93. ***Former AeroVironment Employee #6 ("FE6").*** FE6 worked for BlueHalo in Huntsville, Alabama from March 2023 until May 2025 as Director of Business Development. She was re-badged an AeroVironment employee after the acquisition in May 2025 and remained with the Company until January 2026 in the same role. She was responsible for developing growth and pipelines for future contract wins. FE6 noted that, given her prior Air Force and Space Force military service, people went to her because she was the most knowledgeable about both services. FE6 reported to SVP Business Development Larry Lloyd at BlueHalo and later to AeroVironment VP of Business Development Bob Horky.

94. FE6 stated that, because of personal relationships, she spoke with senior leaders in the military about the BADGER program. She commented, "It was more of the senior leadership speaking to me." FE6 explained that she attended the Air and Space Force Association's 2025 Air,

Space and Cyber Conference on September 23, 2025. During that meeting, the senior acquisition official for Space Force, Major General Stephen G. Purdy—(*i.e.*, the same senior-most Space Force executive described by FE5)—asked FE6 to sit down with him to discuss the SCAR Contract/BADGER program. Major General Purdy and FE6 knew each other from the Air Force and Purdy relayed to FE6 his great concern about the SCAR program. Purdy told her that AeroVironment needed to get itself together, or he was going to fire them. Purdy then discussed his alternative to the BADGER program based on the RFI that was released by the government in March 2025. FE6 stated that Space Force was looking for more solutions for their SCAR program in March 2025 and that was why they released their RFI.

95. When asked when she first learned about the March 2026 RFI, FE6 recalled that she was approached by a former colleague that she served with at the 2025 Air and Space Force Association Warfare Symposium and was asked how the SCAR program was going. Her former colleague then told her about the recent RFI, and that it sure looked like it was the SCAR program.

96. During that symposium, a meeting was already scheduled with Purdy to discuss the SCAR program. Purdy discussed his concerns with the SCAR program, and he wanted to make sure that AeroVironment was working through those concerns. FE6 took notes on her personal cell phone on the issues Purdy was concerned about. Purdy discussed mass, rate, and speed.[4] Purdy also discussed with FE6 the Joint Antenna Marketplace where he believed that the military were going to end up solving the problems with SCAR/BADGER. Purdy told FE6 that the Company

[4] Affordable Mass: A procurement and strategy concept focused on fielding large numbers of lower-cost, often unmanned systems that can replace combat losses at a sustainable rate during contested operations, as opposed to relying solely on a small fleet of expensive, exquisite, crewed platforms. Rate: The production velocity or manufacturing tempo of the defense industrial base; it measures how quickly systems can actually be built, scaled, and delivered during wartime. Speed: The agility and velocity of the acquisition decision-making process to rapidly prototype, test, contract, and field new commercial or defense-specific technologies before they become obsolete.

was getting a lot of money from the government and that he would fire them and that they needed to get it done.

97. FE6 indicated that after her conversation with Purdy on September 23, 2025, she relayed that information in an email to the President of AeroVironment's Space, Cyber, and Directed Energy business Mary Clum, and a few other senior leaders. In those conversations, FE6 detailed what Purdy had to say about SCAR/BADGER. Clum later asked FE6 to help facilitate another meeting with Purdy, which she tried to arrange, but it never materialized.

98. When asked about the Company's monitoring of RFIs, FE6 explained that BlueHalo had a practice of monitoring RFI's. They had business development operations analysts which had numerous searches created, and different people would get those results if something popped up. In addition, most companies used a system called GovWin as a way to keep track of what was going on. That system also posted contracts that were coming up to expire so companies could compete on them early. Companies also used SAM.GOV. FE6 noted that the industry standard was to use these systems as a combination of opportunities and autogenerated searches that are constantly ongoing.

99. ***Former AeroVironment Employee #7 ("FE7").*** FE7 worked as a Vice President at BlueHalo and then AeroVironment from before the merger until the middle of 2026, with responsibility for, among other things, corporate planning. FE7's work was principally for products in Mary Clum's portfolio, though not SCAR/BADGER specifically. FE7 knew and was updated by people working on SCAR on the program's progress, including the stop work order and non-delivery of the system.

100. According to FE7, there were known delivery issues with the SCAR Contract. During the time of the contract, the Company delivered fewer than 10 phased array tiles, and each

one of the BADGER systems was supposed to have 64 tiles. The Company could not get the BADGER system to work and the SCAR program imploded because of non-delivery, which caused the Government to recompete the contract.

101. With respect to AeroVironment's corporate culture and tone at the top, FE7 recounted that the Company and, in particular, Mary Clum, engaged in systematic retribution for truthful disclosures or attempts to correct misrepresentations. For instance, FE7 reported many production problems to Clum regarding a large project overseen by FE7, and was then reassigned as a result. FE7 was terminated for presenting truthful revenue forecasts that did not meet Clum's long-range planning targets, which FE7 described as fraudulent and not true. According to FE7, employees who expressed concerns were fired. The Company fired FE7, her boss, and the person put into her role also quit because they could not confirm the numbers.

102. FE7 relayed in March 2026, Clum attended an offsite meeting where she stated that a $300 million SCAR revenue gap was plugged because the Company had sold other products for that fiscal year, so it was not a problem anymore. Clum said they had delivery issues but 'plugged the hole, redirected, fixed it—nothing to see here.' Because of Clum's 'don't look over here, everything is fine' leadership, Clum was internally known as 'jazz hands.'

103. Delivery of the first BADGER prototype, including development costs, was contracted to be around $200 million. Because the Company exhausted those funds under the first tranche of the contract, they requested more money, but Space Force told them to 'piss off.' According to FE7, Clum was hands-on in negotiations about cost and timelines on BADGER specifically. In turn, AeroVironment would end up in trouble on the back end because they could not deliver on their promises.

104. FE7 advised that McDonnell's March 2026 statement regarding AV being ahead of its competition was not accurate. FE7 noted that there was proposal language describing what the BADGER solution *would* do, but nothing about what the solution was actually capable of doing was ahead of the competition–there was no reconciliation between futuristic language and present reality.

### E. **The 2025 SCAR Request For Information Confirms That Defendants Knowingly Misled Investors About The Status, Progress, And Value Of The SCAR Program/BADGER Contract**

105. Defense contractors such as AeroVironment depend heavily on tools to monitor and alert them to Department of War contracting opportunities, including Requests For Information. A Request For Information ("RFI") is a formal tool used in government contracting and procurement to ask industry partners for general information, pricing, or technical capabilities before releasing a formal solicitation. Through RFIs, the military seeks to learn what available technologies, products, or services exist to solve a specific defense problem. Feedback from industry helps program managers write realistic requirements, realistic cost estimates, and achievable delivery schedules for formal solicitations or Requests For Proposal ("RFP").

106. A critical job for *every* defense contractor is to monitor RFIs relevant to their companies, technologies, and products in anticipation of soon-to-come opportunities or "recompetes" for existing contracts. To ensure that no opportunities or material signals from the Department of War are missed, defense contractors subscribe to a variety of services, such as GovWin IQ, GovTribe, and Lufex, that aggregate government requests and other relevant intelligence, and alert users to potential opportunities. These services, such as GovWin IQ, aggregate pre-RFP intelligence (including RFIs), track opportunities from early acquisition planning through award, and supply proprietary contact and incumbent data that public databases

do not replicate. Tools such as GovWin IQ are so critical to defense contractors that ***60% of federal contract dollars*** in 2024 went to GovWin IQ customers.

107. According to a March 2, 2026 article from Space4Peace, Major General Stephen Purdy had concluded in August 2025 (early in the Class Period) that ***SCAR was "not performing as planned"*** after visiting an AeroVironment competitor (Northwood Space) building next-generation antennas that compete with BADGER. Major General Purdy's public criticism carried particular significance to Defendants, who possessed nonpublic knowledge of the program's technical challenges, shifting requirements, and the true state of BADGER's development. By contrast, a reasonable investor could not have appreciated the significance and import of this statement—in particular given Defendants' continuous assurances to investors that the SCAR Contract was locked in and on track.

### F. The Truth Emerges As The "Locked In" SCAR Contract Collapses And BADGER's Technological Limitations Are Exposed

108. As discussed above, throughout the Class Period, Defendants repeatedly assured investors that "BADGER is ready" and its "technology [was] ready to scale," "most key development milestones for the SCAR program have already been completed," BADGER was "transitioning to production" and "performing really well," and that the "$1 billion [SCAR] franchise" was "locked in." These representations were materially untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading.

109. Beginning in January 2026, the truth emerged through a series of devastating partial disclosures that revealed, in succession, that the Space Force had ordered AeroVironment to stop work on BADGER, had reopened the SCAR program to other vendors, and had ultimately terminated AeroVironment's purportedly "locked in" SCAR Contract. In just three months, the

SCAR Contract went from "performing really well" and "very much on track" to terminated. Defendants were forced, belatedly, to record more than $240 million in goodwill impairments related to the acquisition of BlueHalo and its SCAR Contract. The revelations of the truth caused AeroVironment's investors to suffer devastating losses as the market reacted to each disclosure, the Company's stock price fell precipitously, and AeroVironment lost nearly $7 billion in shareholder value.

### 1. **Just Six Weeks After Assuring Investors That SCAR Was "Very Much On Track," Defendants Stun The Market By Disclosing A Stop-Work Order**

110. On January 20, 2026, AeroVironment filed with the SEC a current report on Form 8-K announcing that, based on a "mutual agreement," the U.S. Government had issued a stop-work order on the Company's agreement to deliver BADGER systems for the SCAR Contract. This bombshell came just six weeks after Defendant Nawabi told investors, on December 9, 2025, that the SCAR program was "shifting now from development activity to delivering products," that BADGER was "transitioning to production" and "performing really well," and that AeroVironment was "very much on track with our plans." Far from "delivering products," AeroVironment had been ordered to stop work entirely.

111. The market was stunned. In response to this disclosure, the price of AeroVironment common stock plummeted $61.97 per share, or approximately 15.77%, from a close of $392.86 per share on January 16, 2026, to close at $330.89 per share on January 20, 2026, on unusually high trading volume.

112. Analysts were caught off guard, particularly in light of Defendants' recent assurances. Piper Sandler reported that the stop-work order was "surprising given indications of new award activity in the second half of calendar 2025." Citizens JMP Securities called the stop-work order "unexpected," writing that it "injects near-term uncertainties."

113. Defendants immediately sought to minimize fallout and spin the news. Rather than indicating any issues with BADGER's technical capabilities or performance, or AeroVironment's ability to deliver the system, Defendants claimed that the stop-work order was only temporary and that the Company was engaged in discussions with the government to amend the contract. In the same Form 8-K announcing the stop-work order, AeroVironment assured investors that the stop-work order "allows for the parties to negotiate an amended agreement for the future of the SCAR program," which the Company "expected to be a firm-fixed price agreement," and that "[t]he Company expects to continue to deliver capabilities and products for the SCAR program."

114. Defendants reinforced that message in private conversations with analysts. For example, Canaccord Genuity, relying on "conversations with management," reported that the stop-work order was "required as the only way to negotiate an amended SCAR agreement in an OTA contract structure," and that "[m]anagement specifically stat[ed] that they believe the new contract discussions [would] be much faster than 90 days" and could even "take one month or less." After hosting a non-deal roadshow with Defendant McDonnell on January 26, 2026, BTIG titled its report "On the road w/ AVAV CFO: no permanent scars from SCAR SWO," relaying that the "SCAR SWO does not reflect shifting priorities," that a "resolution" would be found "within 90 days," and that a "new fixed-price contract [was] anticipated to deliver improved margins."

115. At the same time, Defendants began quietly walking back the value of the program they had spent months promoting. After the stop-work order, management told analysts that it had "signaled limited reliance on this program" and that management's "initial forecast never exceeded the $100M-$200M range for any given year"—a far cry from the "$1 billion franchise" and "$1.7 billion" program Defendants had touted throughout the Class Period.

116. Defendants' reassurances and spin had their intended effect of buoying the Company's stock price. Analysts largely maintained their ratings, crediting management's representations that the SCAR Contract would be renegotiated with minor modifications. For example, Piper Sandler reported that "the most likely scenario" would be a "small revision to specifications" of the program. JMP Securities reiterated its "Outperform" rating, and Canaccord Genuity reiterated its "Buy" rating. On January 30, 2026, Needham & Co. reiterated its "Buy" rating, writing that "we believe the DoW remains highly motivated to procure BADGER with slightly reduced capabilities and lower unit pricing" and expecting a "revised contract finalized." As a result of Defendants' false assurances, AeroVironment's stock continued to trade at artificially inflated prices.

**2. <u>The Space Force Disclosed That It Is Reopening SCAR To Other Vendors, Which Further Revealed Defendants' Earlier Statements As Materially Misleading</u>**

117. Six weeks later, on March 2, 2026, Space News stunned investors when it reported that the U.S. Space Force was reopening the SCAR program to suppliers other than AeroVironment and "reassessing how to move forward." Space News quoted Colonel Owen Stevens, director of contracting at the Space RCO, which supervised SCAR, as stating: "[w]e have been in conversations with the [senior acquisition executive] for a little while now, and we are going to move into a new acquisition strategy for SCAR." Colonel Stevens further stated that this new acquisition strategy "will likely take the form of other companies building versions or variants of SCAR," and that the Space Force "will likely introduce other vendors to the mix."

118. The disclosure that Space Force was reopening the SCAR program to suppliers other than AeroVironment directly contravened Defendants' Class Period representations. Defendants had told investors that SCAR was "locked in," that "the customer is asking for more," and that AeroVironment's team was "shoulder to shoulder with the customer." Now, the Space

Force's own director of contracting revealed that the government was not merely amending AeroVironment's contract, as Defendants had assured the market in January, but was bringing in competitors—and had been discussing a new acquisition strategy "for a little while now."

Analysts reacted sharply, recognizing both the threat to AeroVironment's largest program and the damage to management's credibility. For example, Raymond James downgraded AeroVironment from "Strong Buy" to "Underperform," writing that the news "kicks off a major backlog compression cycle" that "could erase $1-1.4B" from AeroVironment's $2.8 billion total backlog. RBC Capital Markets decried that the "***SCAR program has hurt credibility***," that the "outlook" was "in doubt," and that "AVAV mgmt should be more proactive in managing the stock narrative around the SCAR program" and "***come clean on the SCAR program implications***." JPMorgan similarly reported that the reopening "implies a more fundamental Space Force review that could see a far more limited role for [AeroVironment], ***which comes as a surprise***." BTIG called out Defendants for misleading investors regarding the status of the SCAR Contract, underlining that "***there was previously little doubt from the company that the program would be recompeted in the first place***."

119. These revelations caused the price of AeroVironment common stock to plummet $43.93 per share, or approximately 17.42%, to close at $208.32 per share on March 2, 2026, on unusually high trading volume.

120. Defendants again tried to downplay the news. That same day, at the Citizens Technology Conference, Defendant McDonnell insisted that "[w]e didn't cancel the contract. We're still on the program. We still have a contract," and that "we have a fixed price and a set delivery schedule and all the things that comes with that, and that's the process we're in now of negotiating the go-forward contract." In direct response to the news that the Space Force was

bringing in other vendors, McDonnell dismissed the development as "a little bit of a game of them trying to make us go faster, I think," assuring investors that "we're multiple years ahead of any particular competitors in the market."

121. The next day, on March 3, 2026, AeroVironment issued a press release announcing "Active Negotiations for Contract Amendment to Support U.S. Space Force's SCAR Program," which stated:

> ***We remain in active negotiations with the U.S. Space Force regarding AV's contract to deliver ground stations to support the SCAR program***. AV appreciates that ***the contract was temporarily paused while both parties work together on a firm-fixed-price contract that provides a commercialized product solution with an expedited delivery timeline***.

The press release further assured investors that AeroVironment "is confident in its ability to successfully deliver our systems ahead of competitors."

122. Many securities analysts credited Defendants' assurances that the SCAR Contract would be salvaged. RBC Capital Markets maintained its "Outperform" rating because "the company continues to expect a successful renegotiation on at least a part of the program by ~May." JPMorgan noted that AeroVironment had stated "that the contract was not cancelled, the go forward contract is being negotiated." And Canaccord Genuity, though describing the news as a "letdown," maintained its "Buy" rating, writing that "[m]anagement noted that the extensive capabilities of the stackable BADGER tiles and its manufacturing scale and strong program execution give it a strong competitive advantage relative to other vendors," and crediting the March 3 press release "indicating that [AeroVironment] is still in active contract negotiations with the Space Force on revised SCAR economics and program requirements." As a result, Defendants prevented a total collapse of AeroVironment's stock price.

### 3. Defendants Finally Admit That The Space Force Terminated The SCAR Contract And Belatedly Record A Goodwill Impairment

123. On March 10, 2026, AeroVironment announced its financial results for the third quarter of fiscal year 2026 and held a conference call with analysts and investors to discuss the results (the "Q3 Earnings Call"). During the Q3 Earnings Call, Defendant Nawabi revealed that the Space Force had completely terminated the Company's $1.7 billion SCAR Contract, and admitted that "we could not come to a mutually acceptable agreement with our customer to modify the existing contract and resume work":

> ***[T]he U.S. Space Force has concluded to terminate our existing contract*** for convenience, pay us for our allowable incurred cost with a fee ***and enable AV to recompete for the program*** with their revised requirements and our proposed solution.

124. In other words, the $1.7 billion program that Defendants had told investors was "locked in" was gone. Just one week earlier, Defendants had insisted that "[w]e didn't cancel the contract. We're still on the program. We still have a contract," the SCAR Contract was merely "temporarily paused," and AeroVironment was "multiple years ahead of any particular competitors in the market" and "confident in its ability to successfully deliver our systems ahead of competitors." Those assurances proved false. Rather than holding a secure, multi-year production contract—or even the "temporarily paused" one Defendants had described—AeroVironment would now have to compete for the program against the very competitors Defendants had dismissed just one week earlier.

125. The collapse of the SCAR Contract devastated AeroVironment's previously reported financial results. The Company revealed a massive third-quarter operating loss of $179 million—many multiples (over 57x) higher than the operating loss of just $3.1 million recognized for the same period in fiscal year 2025. The loss was driven principally by a $151.3 million goodwill impairment associated with AeroVironment's Space reporting unit. AeroVironment also

lowered its fiscal year 2026 revenue guidance from $1.95 billion–$2.0 billion to $1.85 billion–$1.95 billion. Defendant McDonnell (CFO) admitted that these negative results were tied directly to the SCAR stop-work order and contract termination:

> ***The well-publicized stop work order for the SCAR program did have a negative impact on the quarter and this is in part the reason we are lowering our full-year guidance. This resulted in a noncash $151 million goodwill impairment*** as the evaluation of the acquired asset, the space business, was ***triggered by the SCAR stop-work order***. The reevaluation resulted in a reduction in the acquisition date value of the acquired space business of approximately 17%. ***We do not expect any further adjustments to the impairment as a result of the notification of the customer to terminate the contract for convenience***.

126. The next day, AeroVironment filed its Quarterly Report on Form 10-Q, which reported the $151.3 million impairment and represented that the Company's disclosure controls and procedures were effective as of January 31, 2026.

127. On this news, AeroVironment's stock price fell $13.84 per share, or 6.25%, to close at $207.73 per share on March 11, 2026, on heavy trading volume.

128. Analysts found the news "disappointing to say the least." Piper Sandler described the termination as the "final affirmation of investors' fears," which had "played out through a 44% decline in shares over the last seven weeks." Multiple analysts slashed their price targets on the Company's shares. For example, on March 11, 2026, Canaccord Genuity again reduced its price target, from $330 to $300, and on March 12, 2026, BTIG slashed its price target from $415 to $330, citing a "disappointing . . . SCAR termination."

#### 4. <u>Defendants Restate The SCAR-Related Goodwill Impairment And Disclose A Material Weakness In Internal Controls</u>

129. Defendant McDonnell's assurance that Defendants did "not expect any further adjustments to the impairment" did not last long. On June 22, 2026, AeroVironment announced that its Audit Committee had determined that the Company's results for the quarter ended January 31, 2026 required restatement because the Company had falsely calculated the carrying value used

in its goodwill impairment analysis of the Space reporting unit—specifically, by failing to allocate goodwill resulting from acquired deferred tax assets and liabilities. As a result, the SCAR-related goodwill impairment had been understated by $89.4 million, or 59%, bringing the total corrected impairment to $240.7 million. The restatement further revealed that AeroVironment's loss from operations had been understated by $89.4 million, its net loss had been understated by $87.3 million, and its total assets and stockholders' equity had been overstated by $89.4 million and $87.3 million, respectively.

130. AeroVironment also disclosed a newly identified material weakness in its internal control over financial reporting relating to "the preparation and review of the goodwill impairment analysis," and admitted that its disclosure controls and procedures were not effective as of January 31, 2026. The restatement confirmed that the true financial impact of the SCAR Contract's collapse was materially greater than Defendants had previously represented, and the admission of ineffective disclosure controls and procedures was contrary to the certifications Defendants had made just three months earlier.

131. On this news, AeroVironment's stock declined $18.28 per share, or approximately 11%, from $169.61 to $151.33 per share, on unusually high trading volume.

132. In total, the four partially corrective disclosures described above caused AeroVironment's stock price to decline by more than $138 per share—falling $61.97 per share (15.77%) on January 20, 2026; $43.93 per share (17.42%) on March 2, 2026; $13.84 per share (6.25%) on March 11, 2026; and $18.28 per share (approximately 11%) on June 22, 2026. Measured against AeroVironment's $392.86 per share closing price on January 16, 2026, the last trading day before the first disclosure, those declines amounted to approximately 35% of the

Company's stock price and erased nearly $7 billion in market capitalization/shareholder value, causing Lead Plaintiffs and other Class members to suffer significant losses and damages.

### G. **Defendants Also Overstated Multiple Key Financial Metrics Tied To The SCAR Contract**

133. In addition to misrepresenting the status, readiness, and value of the SCAR Contract, Defendants materially misstated several key AeroVironment valuation and performance metrics related to the SCAR Contract, including AeroVironment's goodwill, GAAP operating results, and EBITDA. Defendants have now admitted to these misstatements, which were included in the Company's reported financial results on Forms 10-Q for the first three quarters of fiscal year 2026.

134. On September 10, 2025, in connection with the filing of AeroVironment's financial results for the Company's first quarter ended August 2, 2025—the Company's first disclosed financial results since the close of the BlueHalo acquisition—Defendants reported approximately $2.3 billion of goodwill associated with the BlueHalo acquisition as an asset on its balance sheet, and disclosed a loss from operations of $69.3 million, a net loss of $67.4 million, a basic and diluted net loss per share of $1.44, and total assets and liabilities of $5.62 billion and $1.20 billion, respectively. Defendants subsequently reported updates and continued to misstate these same metrics on December 10, 2025 and March 11, 2026, in connection with AeroVironment's reported financial results for the second and third fiscal quarters of 2026.

135. Each of these Forms 10-Q also represented that the financial statements "present fairly, in all material respects, our financial position, results of operations and cash flows in conformity with U.S. GAAP," and the first and second quarter Forms 10-Q further represented that Defendants had "***not identified any events or circumstances that could trigger an impairment***

***review***" prior to the Company's annual impairment test, "including taking into account the reporting units identified from the BlueHalo acquisition."

136. AeroVironment's reported goodwill attributable to BlueHalo as of August 2, 2025 was $2.3 billion. In substance, goodwill is the residual produced by acquisition accounting—it reflects the purchase price paid for BlueHalo minus the fair value of the assets and liabilities acquired by AeroVironment in the acquisition. *See supra* ¶36.

137. Under ASC 350, public companies like AeroVironment are required to test goodwill for impairment at least annually, or on an interim basis when indicators, or "triggering events," are present, such as adverse changes in the business climate or market that might negatively impact the value of a reporting unit. Here, Defendants claimed that they "test for goodwill impairment . . . ***when events or circumstances change in a manner that indicates goodwill might be impaired***." As part of this testing, Defendants further claimed that they "first assess qualitative factors, macroeconomic conditions, industry and market considerations, triggering events, cost factors, and overall financial performance, to determine whether it is necessary to perform a quantitative goodwill impairment test."

138. Interim goodwill impairment testing is thus required if an event occurs or circumstances change that indicate that it is more likely than not that the fair value of a reporting unit is less than its carrying amount. *See* ASC 350-20-35-30. Pursuant to ASC 350-20-35-3C, relevant indicators of potential impairment prior to and/or during the Class Period included, in pertinent part, "***[i]ndustry and market considerations*** such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development." Defendants'

knowledge of the SCAR Contract's underperformance and the related Space Force threats of immediate contract cancellation were "triggering events" under ASC 350-20, such that the goodwill associated with the Company's Space reporting unit required a write down for impairment as of the start of the Class Period as well as throughout the Class Period.

139. Defendants eventually issued restated financials, admitting that their goodwill and associated financial metrics were materially misstated during the Class Period. Defendants were forced to take a goodwill impairment charge of $151.3 million on March 9, 2026 as a direct result of the "stop-work order received on the Company's Other Transaction Agreement for the delivery of BADGER phased array antenna systems to support Space Force's SCAR program." Then, on June 22, 2026, Defendants *admitted* their assessment of goodwill and related financial metrics was false and had misstated the goodwill associated with the acquisitions and the carrying value of AeroVironment's Space reporting unit, by restating the Company's Quarterly Report for the quarterly period ended January 31, 2026. Defendants massively increased their previously reported goodwill impairment to ***$240.7 million*** from just $151.3 million and further admitted that the Company's loss from operations was understated by $89,402,000, net loss was understated by $87,272,000, basic and diluted net loss per share was understated by $1.75 and $1.79 respectively, and that total assets and stockholder equity were overstated by $89,402,000 and $87,272,000, respectively.

**H. Post-Class Period Developments**

140. On September 16, 2026, further to a sources sought notice first issued in March 2026, the Secretary of the Air Force released a request for proposal seeking to replace BADGER. The request, which sought proposals from both industry and defense contractors, adopted a "phased, risk-informed approach" to "augment existing Department of War satellite command and control capabilities." In other words, the request recognized BADGER's technological limitations,

AeroVironment's inability to satisfy the government's needs under the SCAR program, and signaled the end of the Company's unworkable all-in-one approach—and further underscored that AeroVironment's technology was never consistent with Defendants' misstatements and omissions during the Class Period.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

141. Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions, which are particularized below.

### A. Defendants' Materially False And Misleading Statements And Omissions Concerning The Status Of The SCAR Contract

142. During the Class Period, Defendants misleadingly touted the status of the SCAR Contract, including by presenting it as, for example, "locked in" and "won" by AeroVironment.

143. On September 17, 2025, at the RBC Industrials Conference, Defendant Nawabi stated that the government was "upgrading the entire space department's—the entire Department of Defense's geosynchronous satellites RF communication with our phased array SCAR, ***it's a $1.7 billion program that we won against the major primes***" and "***is going to be produced this year***."

144. On September 30, 2025, at AeroVironment's Investor Open House, Defendant Nawabi emphasized that "what set us apart" on the SCAR program was the "way we work . . . we listen, we adapt and we designed with them. ***So SCAR's a program locked in, in a very high barrier to entry market. [B]ut our team did it***." Later in the presentation, Defendant Clum further commented that the SCAR program was an "***awarded value of $1.7 billion, extending all the way through . . . 2030***."

145. The statements set forth above in ¶¶143-44 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein. Defendants' statements touting AeroVironment's SCAR program as, for example, "locked in" and "won" were materially false and misleading and omitted necessary information because the reality known by Defendants but concealed from investors was that the BADGER system lacked basic functionality, had yet to resolve intractable technical challenges related to its most critical component, the MSDA tile, and was many years behind schedule. Defendants also knew that the SCAR Contract was likely to be terminated because the Space Force had threatened to terminate it, including due to AeroVironment's failure to perform and misrepresentations concerning the readiness of its BADGER technology and it was actively seeking competing bids.

146. For example, as detailed above, former BlueHalo/AeroVironment employees reported that prior to and throughout the Class Period (i) BADGER lacked basic functionality; (ii) the Space Force threatened to cancel the SCAR Contract; (iii) every meeting between the Company and the Space Force was contentious; (iv) the Space Force was considering diversifying vendors and shutting down BADGER because AeroVironment was not meeting requirements and was even lying about its progress and production timeline; (v) Company management was told by their own technical teams that the BADGER timelines were unachievable; and (vi) Defendant Nawabi personally acknowledged at an August/September 2025 all-hands meeting, with Defendant Clum present, that the Space Force was unhappy with AeroVironment and that senior management was trying to rebuild the trust because the Company was likely to lose the customer and the SCAR Contract. Further, Defendants were highly motivated to misrepresent the status of the SCAR Contract and BADGER's progress, including because they collectively engaged in insider selling to the tune of nearly $6 million worth of their personal AeroVironment stock holdings at inflated

prices and because they wanted to avoid or delay having to publicly disclose facts revealing that they had vastly overpaid for BlueHalo in the acquisition.

147. Further and in any event, for the reasons set forth immediately above, the statements set forth in ¶¶143-44 were materially misleading half-truths that omitted critical qualifying information.

## B. Defendants' Materially False And Misleading Statements And Omissions Concerning The Readiness And Timeline Of The BADGER System And SCAR Program

148. During the Class Period, Defendants repeatedly told investors that BADGER was ready to scale or already scaling, that AeroVironment was ready to build more, and that the SCAR Contract program was in production.

149. On September 19, 2025, AeroVironment issued a press release announcing a "new firm-fixed-price (FFP) contract option with the U.S. Space Force Space Rapid Capabilities Office for the delivery of two BADGER phased array antenna systems to support the Satellite Communication Augmentation Resource (SCAR) program." The press release:

(a) quoted Defendant Nawabi as stating: "our team is ***scaling BADGER production to match the operational tempo demanded by the Space Force***."

(b) stated that "***most key development milestones for the SCAR program have already been completed. [AeroVironment] will deliver the first BADGER unit to the Space Force in the coming months, with more units nearing completion for delivery in early 2026 to support full-scale overseas deployment***."

(c) quoted Defendant Clum as touting "the expansive satellite tracking, telemetry, and control capabilities [that AeroVironment] ***will soon deliver to the Space Force***" and stating "***[w]ith the technology ready to scale,*** we have accelerated production and strengthened our supply chain to meet the demand. ***BADGER is ready.*** SCAR is coming."

150. On September 30, 2025, during AeroVironment's Investor Open House, Defendant Clum touted that AeroVironment's team was "shoulder to shoulder with the customer," *i.e.,* the Space Force, and assured investors that "***we're ready to scale***" and "***we're ready to build more***."

151. On December 9, 2025, during AeroVironment's Q2 2026 earnings call, Defendant Nawabi:

(a) stated that SCAR "represents a tremendous growth opportunity for [AeroVironment] as ***more BADGER systems move into production***," and that the program is "***shifting*** now from development activity ***to delivering products, most of which is going to end up eventually going into a firm fixed price contracts***" for the SCAR program.

(b) assured investors that the "transition ***not only ramps up the revenue for the second half of the year, but also improves the margin profile of that business***. ***So we're very much on track with our plans***."

(c) assured investors that "the SCAR and BADGER program and product ***is also transitioning to production***."

(d) stated that "there is certainly a lot more upside on that contract because ***we're just beginning to deliver systems . . . our system is performing really well***."

152. The statements set forth above in ¶¶149-51 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein. Defendants' statements representing that "BADGER is ready," that AeroVironment was ready to scale and build more, and that the SCAR program was shifting from development to delivery and production and was "very much on track" were false and misleading because the reality known by Defendants but concealed from investors was that the BADGER system lacked basic functionality, had yet to resolve intractable technical challenges related to its most critical component, the MSDA tile, and was many years behind schedule.

153. For example, as detailed above, former BlueHalo/AeroVironment employees reported that prior to and throughout the Class Period (i) BADGER lacked basic functionality; (ii) AeroVironment was not meeting requirements and was even lying about its progress and production timeline; (iii) Company management was told by their own technical teams that the BADGER timelines were unachievable; and (iv) Defendant Nawabi personally acknowledged at an August/September 2025 all-hands meeting, with Defendant Clum present, that the Space Force was unhappy with AeroVironment and that senior management was trying to rebuild the trust because the Company was likely to lose the customer and the SCAR Contract. Further, Defendants were highly motivated to misrepresent the status of the SCAR Contract and BADGER's progress, including because they collectively engaged in insider selling to the tune of nearly $6 million worth of their personal AeroVironment stock holdings at inflated prices and because they wanted to avoid or delay having to publicly disclose facts revealing that they had vastly overpaid for BlueHalo in the acquisition.

154. Further and in any event, for the reasons set forth immediately above, the statements set forth in ¶¶149-51 were materially misleading half-truths that omitted critical qualifying information.

### C. <u>Defendants' Materially False And Misleading Statements And Omissions Concerning The Value Of The SCAR Contract</u>

155. During the Class Period, Defendants repeatedly touted the value of the SCAR Contract, telling investors for example that the SCAR Contract would drive significant growth, and it was worth "$1.7 billion" in revenue.

156. On June 24, 2025, during AeroVironment's Q4 2025 earnings call, Defendant Nawabi assured investors that the SCAR program was one of "***several very serious, large growth potential opportunities in front of us***," and told investors that the contract was "***worth about a 1.7***

***billion program funded through the Congressional budget documents. We can scale that and expedite deliveries in the fiscal year 2026 and beyond***."

157. On September 9, 2025, during AeroVironment's Q1 2026 earnings call, Defendant Nawabi stated that "[n]otably, we were awarded – we received an award for $70 million for an additional BADGER units in the quarter, ***and this is part of a larger order we expect to receive in Q2***."

158. On September 30, 2025, at AeroVironment's Investor Open House, Defendant Nawabi commented that "***SCAR and our BADGER space comms is really key. That's a $1 billion franchise***."

159. Also on September 30, 2025, at the Investor Open House, Defendant Clum stated that the SCAR "solution" is "***in very high demand with the Space Force***," and that "***the customer is asking for more***."

160. On December 3, 2025, during a question-and-answer session at the Goldman Sachs Industrials and Materials Conference, Defendant Nawabi listed the SCAR program as one thing "***that's going to contribute to the growth***" of AeroVironment over the next several years, and stated that the program was "***$1.7 billion worth of funding that's going to be put into that*** to modernize the entire U.S. space satellites, geosynchronous satellites with our systems phased arrays."

161. On December 9, 2025, during AeroVironment's Q2 2026 earnings call, with respect to SCAR and BADGER, Defendant Nawabi stated that SCAR "***represents a tremendous growth opportunity for [AeroVironment] as more BADGER systems move into production***," that AeroVironment "***expect[ed] contract awards and task orders in the second half that will convert to revenue and that's part of our forecast, and we're confident that we can achieve that . . . it's***

***a very nice, nice portfolio or basket of contracts and awards that we expect***." Defendant Nawabi also assured that "***U.S. DoD needs [the contracts] desperately and we've been talking about . . . more SCAR and BADGERS. And those are the key areas that we expect more of in our second half of the year***," and that "***we're pleased with the performance so far, and we expect the margins as well as the revenue of that business to actually improve in the third and fourth quarter of this year and continue to improve beyond this fiscal year***."

162. The statements set forth above in ¶¶156-161 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein. Defendants' statements touting the expected value of the SCAR Contract as "$1.7 billion, extending all the way through . . . 2030" and the Space Force's "high demand" for SCAR were false and misleading and omitted necessary information because the reality known by Defendants but concealed from investors was that the BADGER system lacked basic functionality, had yet to resolve intractable technical challenges related to its most critical component, the MSDA tile, and was many years behind schedule. Defendants also knew that the SCAR Contract was likely to be terminated because the Space Force had threatened to terminate it, including due to AeroVironment's failure to perform and misrepresentations concerning the readiness of its BADGER technology and it was actively accepting competing bids.

163. For example, as detailed above, former BlueHalo/AeroVironment employees reported that prior to and throughout the Class Period (i) BADGER lacked basic functionality; (ii) the Space Force threatened to cancel the SCAR Contract; (iii) every meeting between the Company and the Space Force was contentious; (iv) the Space Force was considering diversifying vendors

and shutting down BADGER because AeroVironment was not meeting requirements and was even lying about its progress and production timeline; (v) Company management was told by their own technical teams that the BADGER timelines were unachievable; and (vi) Defendant Nawabi personally acknowledged at an August/September 2025 all-hands meeting, with Defendant Clum present, that the Space Force was unhappy with AeroVironment and that senior management was trying to rebuild the trust because the Company was likely to lose the customer and the SCAR Contract. Further, Defendants were highly motivated to misrepresent the status of the SCAR Contract and BADGER's progress, including because they collectively engaged in insider selling to the tune of nearly $6 million worth of their personal AeroVironment stock holdings at inflated prices and because they wanted to avoid or delay having to publicly disclose facts revealing that they had vastly overpaid for BlueHalo in the acquisition.

164. Further and in any event, for the reasons set forth immediately above, the statements set forth in ¶¶156-161 were materially misleading half-truths that omitted critical qualifying information.

**D. Defendants' Materially False And Misleading Statements And Omissions Concerning The Goodwill Associated With The SCAR Contract And Related Financial Metrics**

165. During the Class Period, AeroVironment misstated in public SEC filings the value of the SCAR Contract and associated goodwill.

166. On September 10, 2025, in a Form 10-Q filed with the SEC and signed by Defendants Nawabi and McDonnell, Defendants reported goodwill of $2.54 billion (with $2.3 billion of that arising from the BlueHalo acquisition), a loss from operations of $69.3 million, a net loss of $67.4 million, a basic and diluted net loss per share of $1.44, and total assets and liabilities of $5.62 billion and $1.20 billion, respectively.

167. On December 10, 2025, in a Form 10-Q filed with the SEC and signed by Defendants Nawabi and McDonnell, Defendants reported goodwill of $2.62 billion (with $2.4 billion of that arising from the BlueHalo acquisition), a net loss of $17.1 million, a basic and diluted net loss per share of $0.34, and total assets and liabilities of $5.64 billion and $1.22 billion, respectively.

168. On March 11, 2026, in a Form 10-Q filed with the SEC and signed by Defendants Nawabi and McDonnell, Defendants reported goodwill of $2.46 billion (with $2.3 billion of that arising from the BlueHalo acquisition and reflecting a $151.3 million goodwill impairment), a loss from operations of $179.0 million, a net loss of $156.6 million, a basic and diluted net loss per share of $3.15, and total assets and liabilities of $5.45 billion and $1.18 billion, respectively.

169. The statements set forth above in ¶¶166-68 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein. Defendants' statements concerning goodwill and related financial metrics were materially untrue, and omitted material facts necessary to make them not misleading. In reality, Defendants knew that AeroVironment would imminently suffer a material customer loss and revenue shortfalls due to BADGER's intractable technical deficiencies and Defendants' inability to produce fully functional BADGER units meeting the SCAR Contract requirements in the number and on the timeline required by the Space Force.

170. For example, as detailed above, former BlueHalo/AeroVironment employees reported that prior to and throughout the Class Period (i) BADGER lacked basic functionality; (ii) the Space Force threatened to cancel the SCAR Contract; (iii) every meeting between the Company

and the Space Force was contentious; (iv) the Space Force was considering diversifying vendors and shutting down BADGER because AeroVironment was not meeting requirements and was even lying about its progress and production timeline; (v) Company management was told by their own technical teams that the BADGER timelines were unachievable; and (vi) Defendant Nawabi personally acknowledged at an August/September 2025 all-hands meeting, with Defendant Clum present, that the Space Force was unhappy with AeroVironment and that senior management was trying to rebuild the trust because the Company was likely to lose the customer and the SCAR Contract. Further, Defendants were highly motivated to misrepresent the status of the SCAR Contract and BADGER's progress, including because they collectively engaged in insider selling to the tune of nearly $6 million worth of their personal AeroVironment stock holdings at inflated prices and because they wanted to avoid or delay having to publicly disclose facts revealing that they had vastly overpaid for BlueHalo in the acquisition.

171. Further, Defendants eventually publicly admitted that their goodwill and associated financial metrics were misstated. Defendants were forced to eventually take a goodwill impairment charge of $151.3 million on March 9, 2026 as a direct result of the "stop-work order received on the Company's Other Transaction Agreement for the delivery of BADGER phased array antenna systems to support Space Force's SCAR program." Then, on June 22, 2026, Defendants *admitted* their assessment of goodwill and related financial metrics was false and had further understated the goodwill associated with the acquisitions and the carrying value of AeroVironment's Space reporting unit, by restating the Company's Quarterly Report for the quarterly period ended January 31, 2026. Specifically, Defendants massively increased their previously reported goodwill impairment to ***$240.7 million*** from just $151.3 million and further admitted that the Company's loss from operations was understated by $89,402,000, net loss was understated by $87,272,000,

basic and diluted net loss per share was understated by $1.75 and $1.79 respectively, and that total assets and stockholder equity were overstated by $89,402,000 and $87,272,000, respectively.

172. Further and in any event, for the reasons set forth immediately above, the statements set forth in ¶¶166-68 were materially misleading half-truths that omitted critical qualifying information.

173. Defendants stated in each of AeroVironment's 1Q26 10-Q, 2Q26 10-Q, and 3Q26 10-Q, signed by Defendants Nawabi and McDonnell, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant" and that such "financial statements have been prepared in accordance with accounting principles generally accepted in the United States ('U.S. GAAP')," and, specifically, in the 1Q26 10-Q and 2Q26 10-Q, that Defendants had "***not identified any events or circumstances that could trigger an impairment review***" prior to the Company's annual impairment test during the fourth quarter of fiscal year 2026, "***including taking into account the reporting units identified from the BlueHalo acquisition*** on May 1, 2025."

174. The statements set forth above in ¶173 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein. Defendants' statements concerning GAAP compliance were materially false and misleading and omitted necessary information because Defendants were aware of triggering events or "red flags" requiring them to reassess AeroVironment's goodwill and related financial metrics for impairment. U.S. Generally Accepted Accounting Principles, and specifically ASC 350-20-35, required Defendants

to review their recorded value of goodwill on an interim basis if a triggering event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount.

175. Defendants were required to perform a goodwill impairment test, including consideration of "red flags," to determine the existence and extent of the impairment because, as detailed above, former BlueHalo/AeroVironment employees reported that prior to and throughout the Class Period (i) BADGER lacked basic functionality; (ii) the Space Force threatened to cancel the SCAR Contract; (iii) every meeting between the Company and the Space Force was contentious; (iv) the Space Force was considering diversifying vendors and shutting down BADGER because AeroVironment was not meeting requirements and was even lying about its progress and production timeline; (v) Company management was told by their own technical teams that the BADGER timelines were unachievable; and (vi) Defendant Nawabi personally acknowledged at an August/September 2025 all-hands meeting, with Defendant Clum present, that the Space Force was unhappy with AeroVironment and that senior management was trying to rebuild the trust because the Company was likely to lose the customer and the SCAR Contract. Further, Defendants were highly motivated to misrepresent the status of the SCAR Contract and BADGER's progress, including because they collectively engaged in insider selling to the tune of nearly $6 million worth of their personal AeroVironment stock holdings at inflated prices and because they wanted to avoid or delay having to publicly disclose facts revealing that they had vastly overpaid for BlueHalo in the acquisition.

176. In violation of these requirements under U.S. Generally Accepted Accounting Principles, Defendants failed to conduct interim impairment testing based on the occurrence of various triggering events or "red flags."

177. Further and in any event, for the reasons set forth immediately above, the statements set forth in ¶173 were materially misleading half-truths that omitted critical qualifying information.

**E. <u>Defendants' Materially False And Misleading Statements Concerning The Risks Involved In The SCAR Contract</u>**

178. During the Class Period, Defendants made materially false and misleading statements and omissions concerning the risks related to AeroVironment's key government contracts, which were presented as merely hypothetical risks when those risks had already materialized.

179. On June 25, 2025, Defendants filed a Form 10-K with the SEC, which Defendant Wahid Nawabi signed and certified (the "2025 Form 10-K"). The 2025 Form 10-K, to which Defendants directed investors during the Class Period, contained a list of "Risks Related to Our Business and Industry," which stated:

> If we fail to establish and maintain important relationships with government agencies and prime contractors, our ability to successfully maintain and develop new business ***may*** be adversely affected.
>
> . . .
>
> These developments and other factors ***could*** cause governmental agencies to reduce their purchases under existing contracts, to exercise their rights to terminate contracts at-will or to abstain from renewing contracts or entering into new contracts, any of which would cause our revenue to decline and could otherwise harm our business, financial condition and results of operations.

180. The 2025 Form 10-K also stated:

> A decline in the U.S. and other government budgets, changes in spending or budgetary priorities, delays in contract awards or in the release of approved funds ***may*** significantly and adversely affect our future revenue.
>
> Because we generate a significant portion of our total sales from the U.S. government and its agencies and from foreign governments, our results of operations ***could*** be adversely affected by government spending caps, delays in the

> government budget process, program starts, the award of contracts or orders under existing contracts, or delays in release of funds by the federal government.

181. The 2025 Form 10-K further stated in a list titled "Risks Related to Our U.S. Government Contracts":

> The actual receipt of revenue on awards included in backlog ***may*** never occur or may change because a program schedule ***could*** change or the program ***could*** be canceled, or a contract ***could*** be reduced, modified or terminated early.
>
> In addition, U.S. government contracts generally contain provisions permitting termination, in whole or in part, at the government's convenience or for contractor default. Since a substantial majority of our revenue is dependent on the procurement, performance and payment under our U.S. government contracts, the termination of one or more critical government contracts ***could*** have a negative impact on our results of operations and financial condition. Termination arising out of our default could result in damage to our reputation, expose us to liability and have a material adverse effect on our ability to re-compete for future contracts and orders.

182. The 2025 Form 10-K further stated:

> If we were suspended or debarred from contracting with the federal government generally, or any specific agency, ***if*** our reputation or relationship with government agencies were impaired, or ***if*** the government otherwise ceased doing business with us or significantly decreased the amount of business it does with us, our revenue and operating results could be materially harmed.

183. The statements set forth in ¶¶179-182 above were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading. The above warnings were materially misleading because they presented the identified risks as merely hypothetical when those exact risks had already materialized.

184. For example, as detailed above, former BlueHalo/AeroVironment employees reported that prior to and throughout the Class Period (i) BADGER lacked basic functionality; (ii) the Space Force threatened to cancel the SCAR Contract; (iii) every meeting between the Company and the Space Force was contentious; (iv) the Space Force was considering diversifying vendors

and shutting down BADGER because AeroVironment was not meeting requirements and was even lying about its progress and production timeline; (v) Company management was told by their own technical teams that the BADGER timelines were unachievable; and (vi) Defendant Nawabi personally acknowledged at an August/September 2025 all-hands meeting, with Defendant Clum present, that the Space Force was unhappy with AeroVironment and that senior management was trying to rebuild the trust because the Company was likely to lose the customer and the SCAR Contract. Further, Defendants were highly motivated to misrepresent the status of the SCAR Contract and BADGER's progress, including because they collectively engaged in insider selling to the tune of nearly $6 million worth of their personal AeroVironment stock holdings at inflated prices and because they wanted to avoid or delay having to publicly disclose facts revealing that they had vastly overpaid for BlueHalo in the acquisition.

185. Further and in any event, for the reasons set forth immediately above, the statements set forth in ¶¶179-182 were materially misleading half-truths that omitted critical qualifying information.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

186. Defendants each acted with scienter in that they knew that their public statements set forth above were materially false and misleading when made, and omitted material facts necessary to make the statements not misleading. The facts set forth herein, when considered collectively, demonstrate a strong inference that each Defendant knew that the statements they made were materially false and misleading. In conjunction with and in addition to the facts set forth above, which Plaintiffs repeat, incorporate, and reallege as if fully set forth herein, Defendants' knowledge or scienter is further evidenced by the facts summarized below.

187. ***First***, Defendants' direct knowledge or scienter is confirmed by the fact that they knew, or at least recklessly disregarded, that the BADGER system's most critical component

remained non-functional; that the Space Force threatened to cancel the SCAR Contract and was actively exploring alternative vendors, and the SCAR Contract was likely to be terminated.

188. For example, former Company employees reported that, in or around August/September 2025, Defendant Nawabi (CEO) personally convened an all-hands meeting with Defendant Clum, who was also present to ***personally address*** BADGER's failures and acknowledge that AeroVironment was at risk of losing its customer (*i.e.,* the Space Force). Another former employee reported that a senior contracting executive with the Space Force personally warned her that the SCAR Contract would be cancelled if the Company did not correct course—a message which she conveyed up the chain of command at AeroVironment and ensured that Defendant Clum received.

189. Former Company employees also reported that Defendants were aware that a formal RFI had been issued in February 2025 which sought information concerning the same technology category as BADGER, with requirements directly overlapping with BADGER's mandates and purported capabilities. Because the Company monitored such RFIs, Defendants knew, or recklessly disregarded, that the RFI alerted Defendants to the fact that the SCAR Contract was likely to be canceled.

190. ***Second***, the SCAR Contract was AeroVironment's largest single contract, representing approximately 37% of the Company's total backlog.[5] BADGER accounted for approximately 19% of Space, Cyber & Directed Energy segment sales and roughly 7% of the Company's total quarterly sales during the Class Period. Because of the importance of the SCAR Contract, Defendant Nawabi himself personally identified SCAR and BADGER as "really key"

[5] Total backlog (funded plus unfunded) at Q3 FY26 was approximately **$4,089.5 million** ($1,120.7 million funded + $2,968.8 million unfunded). The $1,493.2 million SCAR portion thus represented roughly **37%** of total backlog at that point.

for AeroVironment and a "$1 billion" franchise that was specifically on Defendant Nawabi's top 10 list of AeroVironment's offerings he was "most excited" about. Analysts likewise understood SCAR to be "a justification for last year's $4[.1] b[illion] BlueHalo acquisition" and "the jewel of the SCDE segment." Given SCAR's centrality to the Company's business, the BlueHalo acquisition, and the Company's growth narrative, it is implausible that Defendants were unaware of the program's true status.

191. Relatedly, Defendants also repeatedly touted the SCAR Contract and portrayed themselves as knowledgeable about its value and progress throughout the Class Period. For example, Defendants discussed the SCAR Contract at length on every earnings call and at investor conferences throughout the Class Period. Further, analysts reported drawing their conclusions about SCAR from "our conversations with management," from "a discussion with management," and from a non-deal roadshow hosted with Defendant McDonnell. Defendants' decisions to speak repeatedly about the SCAR Contract confirm that they were personally engaged with, and had detailed knowledge of, the program's status. Also, investors were entitled to trust and accept that Defendants were personally knowledgeable about the Company-related topics about which Defendants spoke repeatedly, including BADGER and the SCAR Contract.

192. ***Third***, Defendants also touted their direct and continuous "shoulder to shoulder" access to the Space Force. For example, at AeroVironment's September 30, 2025 Investor Open House, Defendant Clum told investors that AeroVironment's team was "***shoulder to shoulder with the customer***" and personally quoted Dr. Kelly Hammett, Director of the Space Force Rapid Capabilities Office, as having told AeroVironment that "we're going to need a bunch of SCARs, and we're going to need them fast as we can make them." Analysts who attended understood Defendants to be representing that "[c]ustomer urgency and traction" were high and that Defendant

Clum had "dr[awn] attention to a direct quote from a senior U.S. Space Force director . . . emphasizing the immediate need for rapid BADGER deployment." Defendants likewise attributed the SCAR award itself to the Company's "closeness to the customer in the design phase." Thus, Defendants were aware through their direct communications with the Space Force that it was disappointed in the Company's performance, had threatened to terminate the SCAR Contract, and, thus, the SCAR Contract was likely to be cancelled.

193. ***Fourth***, Defendants personally profited from their deception of investors. During the Class Period, Defendants Nawabi (CEO) and McDonnell (CFO) took advantage of the artificially inflated price of AeroVironment's stock caused by their misstatements and omissions by engaging in highly suspicious sales of their personal Company stock holdings.

194. At the same time that Defendants were issuing materially false and misleading statements to investors, Defendants Nawabi and McDonnell—the Company's most senior executive officers—collectively sold 21,596 shares of their AeroVironment stock at artificially inflated prices, realizing nearly $6 million in illicit insider trading proceeds. These Defendants' sales occurred at prices as high as $399.74 per share, just 2.5 percent short of AeroVironment's stock price high during the Class Period.

195. Moreover, as reflected in the chart below, Defendants Nawabi's and McDonnell's sales of AeroVironment stock during the Class Period were dramatically out of line with their trading during the equivalent period prior to the Class Period. Defendant Nawabi sold 17,300 shares of AeroVironment stock during the Class Period ("CP") compared with ***no sales*** in the comparable prior period ("PP"), while Defendant McDonnell more than ***doubled*** the value of his own personal sales.

| | CP: 6.25.25 - 6.22.25 | | PP: 6.30.24 - 6.24.25 | | |
|---|---|---|---|---|---|
| **Insider Name** | **Shares Sold** | **Proceeds From Sales** | **Shares Sold** | **Proceeds From Sales** | **CP vs PP $% Change** |
| Wahid Nawabi | 17,300 | $4,550,765.00 | 0 | $0 | ∞ |
| Kevin McDonnell | 4,296 | $1,387,782.17 | 3,202 | $632,121.57 | 119.5% |

196. Defendants Nawabi's and McDonnell's stock sales during the Class Period also were made at suspicious times and in a suspicious manner. For example, CEO Nawabi's ***only*** sale on July 16, 2025, was not made pursuant to a 10b5-1 plan and occurred just weeks before he would internally discuss the problems with the SCAR Contract at an internal Company all-hands meeting.

197. ***Fifth***, Defendants were motivated to deceive investors to avoid—or at least delay as long as possible—having to publicly disclose facts revealing that they vastly overpaid for BlueHalo in the acquisition.

198. ***Sixth***, Defendants' own post-Class Period statements reveal that their internal expectations for SCAR were far lower than what they told investors during the Class Period. After the stop work order, management told analysts that it had "signaled limited reliance on this program" and that management's "initial forecast never exceeded the $100M-$200M range for any given year." Management similarly conveyed that AeroVironment expected only approximately $175 million in fiscal year 2026 revenue from SCAR. Those internal figures are irreconcilable with Defendants' Class Period representations that SCAR was a ***"$1 billion franchise***." Actual SCAR revenue for fiscal year 2026 was only $121 million. As with Defendants' claim that the program was "locked in," Defendants' retrospective characterization of SCAR as a program on which they placed "limited reliance" confirms that the growth narrative they sold to investors was not the one they maintained internally.

199. ***Seventh***, the Company's restatement and its admission of a material weakness in internal controls over financial reporting further support an inference of scienter as to Defendants'

statements concerning the value of the SCAR Contract and the associated goodwill. On June 22, 2026, AeroVironment's Audit Committee disclosed that it had determined that the Company had erred in calculating the carrying value used in its goodwill impairment analysis of the Space reporting unit by failing to allocate goodwill resulting from acquired deferred tax assets and liabilities. As a result, loss from operations for the three and nine months ended January 31, 2026 was understated by $89.4 million, net loss was understated by $87.3 million, diluted net loss per share was understated by $1.75 and $1.79 respectively, total assets were overstated by $89.4 million, and total stockholders' equity was overstated by $87.3 million. The Company conceded that the error resulted from a newly identified material weakness in its internal control over financial reporting relating to "the preparation and review of the goodwill impairment analysis," and that its disclosure controls and procedures as of January 31, 2026 were "ineffective." The magnitude of the error—which understated the SCAR-related impairment by 59%—together with Defendants' certifications that the Company's disclosure controls were effective, supports a strong inference that Defendants, at a minimum, recklessly disregarded the true financial consequences of the SCAR program's collapse.

200. Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## VII. LOSS CAUSATION

201. During the Class Period, AeroVironment's common stock traded on the NASDAQ. The market for AeroVironment's common stock was open, well-developed, and efficient at all relevant times.

202. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class. Throughout the Class Period,

AeroVironment's stock price was artificially inflated because of Defendants' materially false and misleading statements and omissions, which created false impressions concerning AeroVironment's business, operations, and financial prospects, which included the status and value of the SCAR Contract, and AeroVironment's prospects for continued revenue growth from the SCAR program. When the truth misrepresented and concealed by Defendants' misrepresentations and omissions was revealed to the market and/or the concealed risks materialized, the price of AeroVironment common stock fell precipitously as the artificial inflation was removed. As a result of their purchases of AeroVironment securities at artificially inflated prices during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

203. Among the disclosures that establish loss causation are the following.

204. On January 20, 2026, AeroVironment filed a Form 8-K announcing that the U.S. government had issued a stop-work order on the Company's agreement to deliver BADGER systems for the SCAR program—revealing that, contrary to Defendants' assurances that BADGER was "ready," "ready to scale," and "transitioning to production," and that the SCAR program was "very much on track," AeroVironment had been ordered to stop work on BADGER entirely. *See supra* Section IV.F.1.

205. In response to this disclosure, the price of AeroVironment's common stock fell $61.97 per share, or approximately 15.77%, from a close of $392.86 per share on January 16, 2026, to close at $330.89 per share on January 20, 2026, on unusually high trading volume.

206. Analysts attributed the decline to the stop-work order, which they called "surprising" and "unexpected." *Id.* However, AeroVironment's stock continued to trade at artificially inflated prices because Defendants falsely reassured investors that the stop-work order

merely allowed the parties to negotiate an amended agreement and that the Company expected to continue to deliver products for the SCAR program. *Id.*

207. On March 2, 2026, Space News reported that the Space Force was reopening the SCAR program and would likely bring in other vendors to build "versions or variants of SCAR"—revealing that, contrary to Defendants' assurances that SCAR was "locked in" and that "the customer is asking for more," the Space Force was preparing to replace AeroVironment with competitors. *See supra* Section §IV.F.2.

208. In response to this disclosure, the price of AeroVironment common stock fell $43.93 per share, or approximately 17.42%, to close at $208.32 per share on March 2, 2026, on unusually high trading volume.

209. Analysts attributed the decline to the news concerning SCAR, which they said "hurt credibility" and "kick[ed] off a major backlog compression cycle." *Id.* However, AeroVironment's stock continued to trade at artificially inflated prices because Defendants continued to falsely assure investors that AeroVironment "still ha[d] a contract" and was in "active . . . negotiations with the Space Force."

210. On March 10, 2026, AeroVironment announced its financial results for the third quarter of fiscal year 2026 and disclosed that the Space Force had "concluded to terminate our existing contract," and that the Company had recorded a $151.3 million goodwill impairment "triggered by the SCAR stop-work order""—revealing that the "locked in" SCAR Contract that Defendants had touted as a "$1 billion franchise" was gone, and that the goodwill Defendants had reported in prior quarters without any impairment was overstated. *See supra* Section IV.F.3.

211. On this news, AeroVironment's stock price fell $13.84 per share, or approximately 6.25%, to close at $207.73 per share on March 11, 2026, on heavy trading volume, as analysts described the termination as the "final affirmation of investors' fears."

212. On June 22, 2026, AeroVironment announced that its Audit Committee had determined that the Company's results for the quarter ended January 31, 2026 required restatement, because the SCAR-related goodwill impairment had been understated by 59%, bringing the total corrected impairment to $240.7 million, and disclosed a material weakness in its internal control over financial reporting—revealing that the goodwill impairment and related financial results reported in the Company's third quarter fiscal 2026 Form 10-Q, which Defendants represented were presented "in conformity with U.S. GAAP," were materially misstated. *See supra* Section IV.F.4.

213. On this news, AeroVironment's stock declined $18.28 per share, or approximately 11%, from $169.61 per share to $151.33 per share, on unusually high trading volume.

214. Defendants' false and misleading statements had their intended effect. AeroVironment's stock price closed as high as $409.83 per share during the Class Period, and closed at $392.86 per share on January 16, 2026, the last trading day before the first corrective disclosure. The four corrective disclosures described above caused AeroVironment's stock price to decline by a total of more than $138 per share, erasing nearly $7 billion in market capitalization.

215. The timing and magnitude of the price declines in AeroVironment's common stock, together with analysts' surprise and reactions to the specific disclosures concerning the SCAR program, negate any inference that the losses suffered by Lead Plaintiffs and the other Class members were caused by other factors, such as changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## VIII. INAPPLICABILITY OF STATUTORY SAFE HARBOR

216. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint. The misstatements complained of herein were historical statements or statements of purportedly current facts and conditions existing at the time or prior to when the statements were made.

217. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the statements. As set forth in detail above (*see supra* Sections IV.D-E; V.E) then-existing facts contradicted Defendants' statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosure made by Defendants was insufficient to insulate Defendants from liability for their materially untrue and misleading statements.

218. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because, at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading and the statement was authorized or approved by an executive officer of AeroVironment who knew that the statement was false or misleading when made.

## IX. PRESUMPTION OF RELIANCE

219. The Class is entitled to the presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for AeroVironment's common stock was efficient for the following reasons, among others:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- The omissions and misrepresentations were material;
- AeroVironment securities met the requirements for listing, and were traded in an efficient market;
- The Company's shares were liquid and traded at moderate to heavy volume during the Class Period;
- The Company traded on the NASDAQ and was covered by multiple analysts;
- The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Lead Plaintiffs and members of the Class purchased, acquired and/or sold AeroVironment securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

220. Based upon the foregoing, the market for AeroVironment's common stock promptly digested current information regarding AeroVironment from all publicly available sources and reflected such information in the price of AeroVironment's common stock. All purchasers of AeroVironment's common stock during the Class Period suffered similar injury through their purchase of AeroVironment common stock at artificially inflated prices, and a presumption of reliance applies.

221. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which Defendants had a duty to disclose. Because this action involves Defendants' failure to disclose their knowledge that the SCAR Contract was not "locked in" and the BADGER system was not and would never be ready for production within the timeline promised to the Space Force because of the undisclosed adverse facts in Defendants' possession—information that Defendants

were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material, *i.e.*, that a reasonable investor might have considered the omitted facts important in making investment decisions. Given the importance of SCAR to AeroVironment, as set forth above, that requirement is satisfied here.

## X. CLASS ACTION ALLEGATIONS

222. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired AeroVironment securities between June 25, 2025 and June 22, 2026, inclusive (the "Class Period"), and were damaged upon the revelation of the alleged corrective disclosures (the "Class"). Excluded from the Class are Defendants herein; the officers and directors of the Company, at all relevant times; members of their immediate families; and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

223. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AeroVironment securities were actively traded on the NASDAQ. As of August 1, 2026, there were 50,822,963 shares of AeroVironment common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members of the Class. Record owners and other members of the Class may be identified through records maintained by AeroVironment or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

224. Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

225. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

226. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants made material misrepresentations and omissions as alleged herein;

(b) Whether Defendants engaged in a scheme to mislead investors as alleged herein;

(c) Whether Defendants' acts, as alleged herein, violated the federal securities laws;

(d) Whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e) Whether Defendants' misrepresentations and omissions, as alleged herein, caused the Class members to suffer a compensable loss;

(f) Whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(g) Whether the market for AeroVironment's securities was efficient during the Class Period; and

(h) Whether the members of the Class have sustained damages and, if so, what the proper measure of damages is.

227. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since the joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. EXCHANGE ACT COUNTS

### COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

228. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

229. This Count is asserted on behalf of all members of the Class against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(a) - (c).

230. During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew, or were reckless in not knowing, to be false or misleading because they contained misrepresentations and/or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

231. During the Class Period, Defendants carried out a plan, scheme, conspiracy and course of conduct, which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of AeroVironment securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire AeroVironment securities and options at artificially inflated prices.

232. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for AeroVironment securities.

233. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct and scheme that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of AeroVironment common stock, which was intended to, and did: (a) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, the readiness and timeline of the SCAR program, including the BADGER system and the status of the SCAR Contract; (b) artificially inflate and maintain the market price of AeroVironment common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase AeroVironment common stock at artificially inflated prices and suffer losses when the true facts became known and/or the risks materialized.

234. AeroVironment and the Executive Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

235. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of AeroVironment stock, were either known to Defendants or were so obvious that the Defendants should have been aware of them.

236. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for AeroVironment securities, and that inflation was removed from its price when the relevant truth concealed by Defendants' misrepresentations and omissions became known.

237. Defendants' wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of AeroVironment common stock and that the ultimate disclosure of relevant truth concealed by Defendants' misrepresentations and omissions, or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of AeroVironment common stock to decline.

238. Accordingly, as a result of their purchases of AeroVironment securities during the Class Period, Lead Plaintiffs and the Class suffered economic loss and damages under the federal securities laws.

239. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

240. This claim is brought within the applicable statute of limitations.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Executive Defendants)**

241. Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

242. During the Class Period, the Executive Defendants participated in the operation and management of AeroVironment, and conducted and participated, directly and indirectly, in the conduct of AeroVironment's business affairs. Because of their senior positions, they knew the adverse non-public information about AeroVironment's misstatements of income and expenses and false financial statements.

243. As officers and/or directors of a publicly owned company, the Executive Defendants had a duty to disseminate accurate and truthful information with respect to AeroVironment's financial condition and results of operations, and to correct promptly any public statements issued by AeroVironment that had become materially false or misleading.

244. Because of their positions of control and authority as senior officers, the Executive Defendants were able to, and did control the contents of the various reports, press releases, and public filings that AeroVironment disseminated in the marketplace during the Class Period concerning AeroVironment's results of operations. Throughout the Class Period, the Executive Defendants exercised their power and authority to cause AeroVironment to engage in the wrongful acts alleged herein. The Executive Defendants, therefore, were "controlling persons" of AeroVironment within the meaning of Section 20(a) of the Exchange Act. In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of AeroVironment securities.

245. Each of the Executive Defendants, therefore, acted as a controlling person of AeroVironment. By reason of their senior management positions and/or acting as directors of AeroVironment, each of the Executive Defendants had the power to direct AeroVironment's actions, and exercised that power, which caused AeroVironment to engage in the unlawful acts and conduct alleged herein. Each of the Executive Defendants exercised control over the general operations of AeroVironment and possessed the power to control the specific activities that comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

246. By reason of the above conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by AeroVironment.

## COUNT III

### (Violations of Section 20A of the Exchange Act Against the Insider Trading Defendants (Nawabi and McDonnell))

247. Lead Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

248. This count is asserted against Defendants Nawabi and McDonnell for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, on behalf of all members of the Class.

249. While AeroVironment's securities traded at artificially inflated prices, Defendant Nawabi profited by selling approximately 17,300 shares of AeroVironment common stock on July 16, 2025, while in possession of adverse, material non-public information about AeroVironment, liquidating approximately $4.5 million through illegal insider trading transactions, as detailed above (¶¶193-96). Defendant McDonnell profited by selling 4,296 shares of AeroVironment

common stock between October 10, 2025, and March 10, 2026, while in possession of adverse, material non-public information about AeroVironment, liquidating $1,387,782.17, as follows:

| Date | Shares | Proceeds |
|---|---|---|
| 10/10/2025 | 998 | $398,940.52 |
| 11/10/2025 | 513 | $170,038.98 |
| 12/10/2025 | 511 | $127,428.07 |
| 01/12/2026 | 999 | $367,232.4 |
| 02/10/2026 | 879 | $235,220.4 |
| 03/10/2026 | 396 | $88,921.8 |

250. Lead Plaintiffs purchased AeroVironment common stock on a national securities exchange contemporaneously with Defendant Nawabi's sale. On July 17, 2025, Lead Plaintiff Miami Beach F&P purchased 1,369 shares of AeroVironment common stock. Lead Plaintiffs also purchased AeroVironment common stock on a national securities exchange contemporaneously with Defendant McDonnell's sales. On February 13, 2026, and March 12, 2026, Lead Plaintiff City of Miami F&P purchased 350 and 600 shares of AeroVironment common stock, respectively.

251. Lead Plaintiffs and all other members of the Class who purchased AeroVironment common stock in domestic transactions or on U.S. exchanges contemporaneously with the sales of AeroVironment common stock by Defendants Nawabi and McDonnell have suffered damages because:

a. In reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b), 20(a), and 20A of the Exchange Act, as alleged herein; and

b. They would not have purchased AeroVironment common stock at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants Nawabi's and McDonnell's false and misleading statements and omissions alleged herein.

252. By reason of the foregoing, Defendants Nawabi and McDonnell violated Section 20A of the Exchange Act and are liable to Lead Plaintiffs and the other members of the Class for

the substantial damages suffered in connection with their contemporaneous purchases of AeroVironment common stock in domestic transactions or on U.S. exchanges during the Class Period.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs demand judgment against Defendants as follows:

A. determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as Class representatives;

B. awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. awarding such equitable, injunctive or other further relief as this Court may deem just and proper.

## XIII. JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.

DATED: October 5, 2026

Respectfully submitted,

*/s/ Susan R. Podolsky*
Susan R. Podolsky (Va. Bar No. 27891)
**LAW OFFICES OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Telephone: (571) 366-1702
Fax: (703) 647-6009
spodolsky@podolskylaw.com

*Liaison Counsel for the Court-Appointed Lead Plaintiffs City of Miami Fire Fighters' and Police Officers' Retirement Trust and City Pension Fund for Firefighters and Police Officers in the City of Miami Beach*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN**
Jeremy P. Robinson (*pro hac vice*)
Alec T. Coquin (*pro hac vice*)
Abygail R. Kritta (*pro hac vice* forthcoming)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
jeremy@blbglaw.com
alec.coquin@blbglaw.com
abygail.kritta@blbglaw.com

*Counsel for the Court-Appointed Lead Plaintiffs City of Miami Fire Fighters' and Police Officers' Retirement Trust and City Pension Fund for Firefighters and Police Officers in the City of Miami Beach*

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice* forthcoming)
Lester R. Hooker (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com

-and-

Marco A. Dueñas (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Telephone: (914) 437-8551
Fax: (888) 631-3611
mduenas@saxenawhite.com

-and-

David Kaplan (*pro hac vice*)

Emily R. Bishop (*pro have vice*)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: (858) 987-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com
ebishop@saxenawhite.com

*Counsel for the Court-Appointed Lead Plaintiffs City of Miami Fire Fighters' and Police Officers' Retirement Trust and City Pension Fund for Firefighters and Police Officers in the City of Miami Beach*

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON, P.A.**

Robert D. Klausner
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
Fax: (954) 961-1232
bob@robertdklausner.com

*Additional Counsel for the Court-Appointed Lead Plaintiffs City of Miami Fire Fighters' and Police Officers' Retirement Trust and City Pension Fund for Firefighters and Police Officers in the City of Miami Beach*